[Cite as *In re D.M.*, 2009-Ohio-4112.]


# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY


IN THE MATTER OF:

    D.M.,

ALLEGED NEGLECTED
AND DEPENDENT CHILD,

[JULIE HENRY-WALLACE,
MOTHER-APPELLANT].

CASE NO.  5-09-12


O P I N I O N


IN THE MATTER OF:

    O.M.,

ALLEGED NEGLECTED
AND DEPENDENT CHILD,

[JULIE HENRY-WALLACE,
MOTHER-APPELLANT].

CASE NO.  5-09-13


O P I N I O N


IN THE MATTER OF:

    B.M.,

ALLEGED NEGLECTED
AND DEPENDENT CHILD,

[JULIE HENRY-WALLACE,
MOTHER-APPELLANT].

CASE NO.  5-09-14


O P I N I O N

Case No. 5-09-12

**Appeal from Hancock County Common Pleas Court,**
**Juvenile Division**
**Trial Court Nos. 20730017, 20730018, 20730019**

**Judgments Affirmed**

**Date of Decision:    August 17, 2009**

**APPEARANCES:**

*Aaron J. Ried* **for Appellant**

*Kristen Johnson* **for Appellee, Hancock Co. JFSCPSU**

**ROGERS, J.**

{¶1} In cases numbered 5-09-12, 5-09-13, and 5-09-14, Mother-Appellant, Julie Henry Wallace, appeals the judgments of the Hancock County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of her three children to the Hancock County Job and Family Services, Children's Protective Services Unit (hereinafter "CPSU"). In this consolidated appeal, Mother argues that the trial court abused its discretion

because CPSU did not present clear and convincing evidence that permanent custody was warranted. Based upon the following, we affirm the judgments of the trial court.

{¶2} In May 2007, CPSU filed complaints alleging that B.M. (DOB: 2/25/1998), O.M. (DOB: 10/18/2000), and D.M. (DOB: 8/18/2001) (hereinafter B.M., O.M., and D.M. collectively referred to as "the children"), were neglected because of an incident during which Mother, while under the influence of drugs, repeatedly drove off the road with the children in the car and nearly ran over one of the children, and because the family home was unsafe and unsanitary. Additionally, CPSU requested ex-parte temporary custody of the children.

{¶3} In June 2007, CPSU filed a case plan with objectives that Mother provide and maintain a safe and stable living environment for the children; that Mother undergo mental health and substance abuse treatment; that Mother acquire additional parenting skills and knowledge; and, that Mother acquire additional life skills.

{¶4} In July 2007, the trial court found by clear and convincing evidence that the children were neglected and dependent as defined in R.C. 2151.03(b)(c) and 2151.04(b)(c)(d).

{¶5} In August 2007, the trial court ordered CPSU to assume temporary custody of the children and adopted the case plan filed in June 2007.

{¶6} In November 2007, the case came before the trial court for semi-annual review. In its report, CPSU concluded that it could not recommend reunification because Mother's ability to maintain sobriety, mental health, and safe, stable housing continued to be a concern.

{¶7} In February 2008, CPSU moved for a six-month extension of temporary custody of the children, from May 2008 until November 2008, because Mother failed to complete the case plan objectives and needed more time.

{¶8} In April 2008, CPSU moved for permanent custody of the children, or, in the alternative, a six-month extension of temporary custody. Thereafter, the trial court granted the six-month extension of temporary custody.

{¶9} In May 2008, the case came before the trial court for semi-annual review. In its report, CPSU amended the case objective from reunification to permanent custody on the basis that Mother failed to complete the case plan requirements.

{¶10} In September 2008, the children's guardian ad litem ("GAL")/court appointed special attorney ("CASA"), Gaye Morehead, filed a mediation report stating that the parties agreed to extend CPSU custody and services for six months, to terminate on March 23, 2009. The mediation report listed the following objectives: (1) Mother would successfully engage in individual counseling to address her substance abuse and mental health issues; (2) Mother would

successfully complete the life skills program at Century Health; (3) Mother would successfully complete home-based therapy; (4) Mother would maintain a safe and stable home; and, (5) Mother would maintain sobriety. Thereafter, the trial court granted the six-month extension of temporary custody and services.

{¶11} In February 2009, CPSU again moved for permanent custody of the children on the basis that Father, David May II[1], had abandoned the children; that the children could not or should not be placed with Mother within a reasonable time; and, that permanent custody was in the children's best interests. Specifically, the memorandum in support stated that Mother failed continuously and repeatedly to remedy the conditions causing the children to be placed outside of her home; that Mother's chronic mental illness and chemical dependency made her unable to provide an adequate home for the children; that Mother demonstrated an unwillingness to provide an adequate home for the children; and, that Mother was unwilling to provide the children with basic necessities or to protect them from abuse.

{¶12} In March 2009, the case proceeded to a final hearing, at which the following testimony was heard.

{¶13} Ken Sinkey, a counselor at the Family Services Counseling Center, testified that he worked with D.M. and O.M. from spring 2008 until the time of the

---

[1] We note that Father did not appeal the trial court's judgment granting permanent custody of the children to CPSU and is not a party to this appeal.

hearing; that Kathy Stenfors worked with B.M. during that time period; that he believed D.M. and O.M. believed their family would be "broken up" if they told others about "bad things" that had happened in the family (hearing tr., vol. I, p. 20); that, initially, the children were very forthcoming about the abuse they had experienced in Mother's home, but then recanted on many things and ceased making progress; that it is unlikely the children recanted about the abuse because it did not happen; that the decrease in the children's progress in counseling and the recantation corresponded with them having increased contact with Mother; that he believed from his sessions with O.M. and D.M. that they had been sexually abused; that O.M. had disruptive behavior disorder, which is characteristic of children who have experienced trauma; that B.M. emphatically explained to him that she did not want to live with Mother because she did not protect her, and that she did not provide for the children's basic needs; that B.M. also explained that Mother expected her to protect, feed, and care for O.M. and D.M., even though she was not much older than they; that B.M. was especially fearful of where Mother lived, but would not verbalize why; and, that D.M. and O.M. were "excited" about the prospect of returning to Mother's home.  (Id. at 32).

{¶14} Robin Brown, mental health and substance abuse counselor for Century Health, testified that she kept Mother's patient records back to 2000; that Century Health treated Mother primarily for chemical dependency and substance

abuse; that Mother abused alcohol, cannabis, pain medication, and opiates; that Mother was also diagnosed with depression and bipolar disorder; that, in May 2007, Mother overdosed on Percocet, Darvocet, and alcohol; that CPSU removed the children from Mother's home at that point, and Mother entered counseling in June 2007; that Mother failed to attend any appointments until July 2007; that, from July 2007 until January 2008, Mother attended some appointments, but missed more appointments than she attended; that, in late January 2008, Mother entered Devlac Hall, an inpatient, residential substance abuse and chemical dependency program; that Mother did not complete the Devlac program and left against medical advice; that, from that point, Century Health recommended to Mother that she engage in individual treatment, group treatment, and community support treatment, such as Alcoholics Anonymous, one to four times per week; that, in April 2008, Mother began attending treatment sessions more regularly; that Mother began to show progress from April 2008 until mid-August; that, at that point, Mother was discharged from intensive treatment, entered into the "Living Skills" program, and was advised to attend relapse prevention sessions; that Mother did not attend any relapse prevention sessions; that Mother missed many appointments in the following months and only attended two individual sessions in December 2008 and January 2009; that Mother admitted in December 2008 that she had been using marijuana, but failed to attend a follow-up session or re-enter

treatment as recommended; that, in 2008, fifty-four total appointments were set up for Mother, but she attended only thirty-four; that none of Mother's drug screens had tested positive for opiates; but, that Mother's lack of attendance inhibited the agency's ability to screen her for drug use on a regular basis; and, that Mother was at a moderate to high risk of relapse.

{¶15} Brenda Hoose testified that she and Mother became friends when they both attended Narcotics Anonymous; that she associated with Mother from April 2008 to October 2008; that, in October 2008, she witnessed Mother use marijuana three times; and, that Mother told her not to tell anyone, because it would influence whether she was able to regain custody of the children.

{¶16} Wendy McCormick, Mother's sponsor from Narcotics Anonymous, testified that she became concerned about Mother's sobriety in early November 2008 because she stopped contacting her and began to distance herself from the support group; that she was also concerned because Mother had told her that she often tried to resolve issues by going to the hospital and asking for pain medication; that Mother began making frequent trips to the hospital in fall 2008; and, that the support group attempted to coordinate an intervention for Mother, but Mother refused to allow them into her home and cut off contact with the support group.

{¶17} Kim Odone testified that she was Mother's sponsor in Narcotics Anonymous; that, just prior to Mother's admission into Devlac Hall, she told her that O.M. had died, which Mother later admitted to her she made up because she wanted attention; that Mother participated in Narcotics Anonymous meetings for awhile and was making progress, but then she began to lose contact; that she became aware that Mother was making visits to the hospital to get pain medication; that, in October 2008, an allegation arose that Mother had used marijuana; and, that she encouraged Mother to get a drug screen to refute the allegation, but Mother refused.

{¶18} Marlene Davis, the family's social worker, testified that she conducted home-based therapy with the family since November 2008; that therapy was going well because the children were engaging with Mother and Mother was demonstrating appropriate parenting skills; and, that she had no concerns with Mother having unsupervised contact with the children. Davis then testified on cross-examination that she contacted Mark Olthouse, the family's caseworker, in December 2008, requesting to discontinue individual services with Mother because she was not "getting anywhere" with her (Id. at 173); that she was never aware that Mother was not following through with her treatment at Century Health or that she had admitted to using drugs; that knowledge of these facts would have changed her mind about moving to unsupervised visits; that Mother had reported

to her that she was complying with her treatment at Century Health; that she was never aware that the children's counselors did not recommend unsupervised visits with Mother; that she reported to Olthouse that she saw no "red flags" during the sessions (Id. at 178); and, that she was not aware that the children reported to their counselors that B.M. was made to take care of O.M. and D.M. while the children lived in Mother's home.

{¶19} Olthouse testified that he was an ongoing caseworker for CPSU and had worked with the family since May 2007; that the investigation began when Mother nearly backed over one of the children with her car while the other two children were in the car; that he was unaware if alcohol or drugs were involved in the incident because he was not the investigator; that the children were removed from Mother's home due to that incident and because the family home was dangerously out of order and filthy, and Mother was not supervising the children or providing for their basic needs; that Mother indicated that Father had attempted to smother B.M. with a pillow, for which he was convicted and served time in prison; that, from May 2007 until the date of the hearing, the children were continuously in CPSU's custody, which was a total of nineteen months; that he reviewed the case plan with Mother three or four times to be sure she understood; that the case plan required Mother to maintain a safe and stable living environment for the children; that Mother had maintained a clean and stable home, however,

the safety requirement was not met because Mother had not established herself as drug-free; that the case plan required the children to undergo counseling and that the children underwent counseling; that the case plan required Mother to undergo mental health and substance abuse treatment; that Mother did not successfully complete mental health and substance abuse treatment because her attendance was irregular and she repeatedly relapsed; that the case plan required Mother to participate in a life skills program; that Mother did not successfully obtain life skills because she did not attend the program at all; that the case plan required Mother to acquire parenting knowledge and skills and to participate in home-based therapy; that Mother did not complete the parenting skills objective because she delayed in beginning the home-based therapy program; that, in January 2008, Mother told various family members that O.M. had died, which was not true; that, in April 2008, Mother again sought visitation with the children; and, that, during the entirety of his involvement with the case, he never felt comfortable recommending unsupervised visitation because Mother's sobriety had not been established and Mother had "control issues" in handling the children. (Hearing tr., vol. II, p. 237).

{¶20} Olthouse continued that he did not believe Mother could currently provide an adequate permanent home for the children and would not be able to within a reasonable time; that he did not think his opinion would change if Mother

was granted an extension because she had not been able to sustain progress with the case plan for the past two years; that the children had regressed in their behavior since having more contact with Mother; that, after being placed in foster care, B.M. never indicated she wanted to go back to Mother's home; that D.M. and O.M. had indicated they wanted to return to Mother's home initially, but no longer did; that he spoke to D.M. and O.M. about seeking an adoptive home for them, and they smiled and agreed; that B.M.'s relationship with Mother was especially strained; that D.M. and O.M. had functional interaction with Mother, but were very well-adjusted and happy in their foster home; that O.M. had educational delays and deep emotional problems; and, that D.M. had behavioral and motor skill problems. Olthouse then concluded that the children's interests would be best served by being placed in CPSU's permanent custody because of their ages, vulnerability, past history, and need for a safe, permanent, and stable lifestyle; and, that Mother had not been able to maintain herself in a position where she could provide a stable, safe environment for the children.

{¶21} David A. Smalley testified that he knew Mother from Narcotics Anonymous meetings; that he attended the meetings approximately four or five times per week; that Mother attended about four meetings per week; that it was clear to him when he initially met her that she had just begun recovery from drug abuse; that, as she attended more meetings, Mother's disposition became more

positive, and she became more involved with the program; that Mother talked about the children and said she loved them and missed them; and, that he never suspected Mother was abusing drugs or alcohol. On cross-examination, Smalley testified that he had a romantic relationship with Mother in January 2009; that he believed she had been drug-free for the entirety of 2008; and, that he and Mother never discussed whether she was completing the requirements at Century Health.

{¶22} Leo Roberts testified that Mother was his sponsor in Narcotics Anonymous; that he attended about fifteen meetings per week; that Mother was devastated when the children were removed from her home; that, in the previous two years, he had at one time suspected that Mother was using drugs and she admitted that she was, but that she was a "different person" now (hearing tr., vol. III, p. 302); and, that he knew Mother was not currently using drugs because he could tell by looking at her.

{¶23} Mother testified that CPSU removed the children from her custody in May 2007; that grief caused by the loss of her children caused her to revert to drug use; that she believed that she was now responsible, accountable for her actions, clean, and working towards recovery; that she last used drugs in January 2008; that she did not use drugs in December 2008, and Hoose made up the story about the marijuana use; that she understood what she needed to do to complete the case plan; that she signed up for parenting classes, but Olthouse told her not to

take those classes; that she did not attend her appointments at Century Health on a consistent basis at first because she was still abusing drugs at that point; that, after she stopped abusing drugs, she missed several appointments because her mother was in an accident and was going to be taken off life support; that she did not complete the life skills program because Olthouse told her she needed to wait until January, but that she had an appointment to begin the program the day after the hearing; that all of her drug screens had been clean; that the home-based therapy visits with Davis were going very well; and, that she had told the children about the changes she made in her life and that things were not the way they used to be.

{¶24} Mother continued that she was present three years prior when Father attempted to smother B.M.; that she was drunk when this incident occurred; that, despite his actions, she went to Father's sentencing hearing after his conviction for felony child endangering and intimidation, and asked the judge to release him from prison; that, when she was using drugs, she did not take care of the children; that she had made several attempts at recovery from substance abuse since 2000; that she told everyone at Devlac Hall that O.M. had died because she was grieving the loss of the custody of her children and had "lost her mind" (Id. at 343); that she left Devlac Hall against medical advice; that she signed a mediation report in September 2008, agreeing to grant temporary custody of the children to CPSU; that she knew she was required by the case plan to participate in individual

counseling to address her substance abuse and mental health issues; that she scheduled an appointment with Century Health in November, but it was cancelled, so Brown's testimony that she had no appointments between August and December was not true; that she never admitted to anyone at Century Health that she relapsed and used drugs in December 2008; that she missed her appointment in December 2008 because her mother was in the hospital and about to be taken off life support; that she had been clean for a year; that she told Olthouse she missed an appointment because her mother was being taken off life support, but her mother woke up that same day after three weeks of being unconscious; that Olthouse was not telling the truth when he testified that he saw her mother sitting up and talking with relatives; that she had not attended any appointments at Century Health since January 2009 because she wrote the date down wrong; that Hoose was lying when she testified that she saw her use drugs; that the frequent trips she made to the hospital in the fall of 2008 were because she had gallbladder problems; that there was "no way" she had fifty-four appointments scheduled with Century Health since January 2008, so it was incorrect that she only attended thirty-four out of fifty-four appointments (Id. at 354); that it was Olthouse's fault she did not begin the life skills group because he told her Davis was going to set her up with classes later; that she did not complete the home-based therapy because Olthouse did not set her up for it until November or December 2008; that

Olthouse only wanted to see her once every two to three weeks; that, in January 2009, Olthouse sent her a letter calling to her attention that only nine weeks remained before the permanent custody hearing, and detailing that she had not adequately addressed her mental health and substance abuse issues and had not begun the life skills group program; and, that she took drug screens in December, January, and February at Century Health that were clean.

{¶25} Morehead, the children's CASA/GAL, testified that she prepared a report and recommendations to the court, and that she recommended termination of parental rights with permanent custody awarded to CPSU because Mother failed to adequately complete the case plan.

{¶26} Thereafter, the trial court issued judgment entries granting CPSU permanent custody of the children. The trial court specifically found that the children had been in the temporary custody of CPSU for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and that, by clear and convincing evidence, it would be in the best interests of the children to grant their permanent custody to CPSU. In the alternative, the trial court determined that the children could not be placed with either parent within a reasonable time or should not be placed with them. The trial court then continued to consider the relevant factors enumerated in R.C. 2151.414(D)(1) through (5) and 2151.414(E)(7) to (11), specifically finding:

The mother has had a long history of alcohol and opiate addiction. Although it was the subject of disputed testimony, this court finds mother is not in recovery and her use continued even after [CPSU] dismissed its original motion for permanent custody and agreed to a 6 month extension of her case plan. Mother left the hospital where she was receiving drug and alcohol treatment against medical advice and failed to appear at her individual counseling where she knew she would be subject to drug testing.

* * * In determining that the child[ren] cannot or should not be placed with the parents within a reasonable time, this court finds that many factors included in Revised Code Section 2151.414(E)(1)-(16) have been proven by clear and convincing evidence to exist. Particularly this court finds that following the placement of the child[ren] outside their home and, not withstanding reasonable cause [sic] planning and diligent efforts by [CPSU] to assist the parents to remedy the problems that initially caused the child[ren] to be placed in foster care, the parents have failed continuously and repeatedly to substantially remedy the conditions which caused said child[ren] to originally be placed in care on May 29, 2007. In determining these factors, the court has considered parental utilization of social and rehabilitative services and material resources that were made available to the parents with the purpose of changing their conduct to allow them to assume and maintain parental duties. The court further finds that the parents are unable to provide an adequate permanent home for the child[ren] at the present time and, as anticipated, within one year after the court holds the hearing in this matter.

This finding is based on items discussed above including the father's history of domestic violence and cruelty towards the children and his complete disinterest in visiting or assuming custody of the children. Mother's drug and alcohol use continued even after [CPSU] dismissed its original motion for permanent custody and agreed to a six-month extension. She refused to submit to drug screens when requested knowing that supplying clean drug screens was a vital part of her case plan.

* * * The court further finds by clear and convincing evidence that continuation in the [children's] own home would be contrary to the [children's] welfare.

**\* \* \* The court finds by clear and convincing evidence that the agency made reasonable efforts to prevent the continued removal of the child[ren] from their home and that by filing a motion for permanent custody that reasonable efforts have been made by the agency to finalize a Permanency Plan.**

(Mar. 2009 Judgment Entries, pp. 3-4).

{¶27} It is from these judgments that Mother appeals, presenting the following assignment of error for our review.

**DUE PROCESS REQUIRES THE DEPARTMENT OF JOB AND FAMILY SERVICES TO PROVIDE CLEAR AND CONVINCING EVIDENCE IN ORDER TO TAKE PERMANENT CUSTODY OF A CHILD AND THERE IS AN ABUSE OF DISCRETION WHEN THAT STANDARD IS NOT MET, WHICH RESULTS IN A VIOLATION OF A PARENT'S FUNDAMENTAL RIGHT.**

{¶28} In her sole assignment of error, Mother contends that the trial court erred in granting permanent custody of the children to CPSU because CPSU failed to present clear and convincing evidence supporting its motion. Specifically, Mother contends that evidence was heard that she maintained a stable home for the children that was clean and orderly; that a social worker testified she had no concerns about Mother having unsupervised contact with the children; and, that she presented her own testimony and testimony from several witnesses as evidence of her sobriety. We disagree that CPSU did not present sufficient evidence.

{¶29} Our review of a grant of permanent custody begins by noting that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic'

civil right." *In re Hayes* (1997), 79 Ohio St.3d 46, 48, citing *In re Murray* (1990), 52 Ohio St.3d 155, 157. Parents have a fundamental liberty interest in the care, custody, and upbringing of their children. *Murray*, 52 Ohio St.3d at 157; *Santosky v. Kramer* (1982), 455 U.S. 745, 753. However, a natural parent's rights are not absolute. *In re Thomas*, 3d Dist. No. 5-03-08, 2003-Ohio-5885, ¶7. "It is plain that the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." *In re Cunningham* (1979), 59 Ohio St.2d 100, 106 (citation omitted).

{¶30} Permanent custody determinations made under R.C. 2151.414 must be supported by clear and convincing evidence. *In re Baby Girl Doe*, 149 Ohio App.3d 717, 738, 2002-Ohio-4470, citing *In re Hiatt* (1993), 86 Ohio App.3d 716, 725. Clear and convincing evidence is "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes* (1986), 25 Ohio St.3d 101, 104. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross v. Ledford*

(1954), 161 Ohio St. 469, 477, citing *Ford v. Osborne* (1887), 45 Ohio St. 1. Thus, we are required to determine whether the trial court's conclusion was supported by sufficient, credible evidence to satisfy the requisite degree of proof, *In re McCann*, 12th Dist. No. CA2003-02-017, 2004-Ohio-283, ¶12, citing *In re Starkey*, 150 Ohio App.3d 612, 617, 2002-Ohio-6892, and, absent an abuse of discretion, the trial court's decision must be upheld. *In re Robison*, 3d Dist. No. 5-07-41, 2008-Ohio-516, ¶8, citing *Masters v. Masters* (1994), 69 Ohio St.3d 83, 85; see, also, *In re Rinaldi*, 3d Dist. No. 1-02-74, 2003-Ohio-2562. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. Id.

**{¶31}** "Once a child has been adjudicated dependent, neglected, or abused and temporary custody has been granted to a children services agency, the agency may file a motion for permanent custody under R.C. 2151.415(A)(4)." *In re Esparza*, 3d Dist. Nos. 9-06-25 & 9-06-27, 2007-Ohio-113, ¶25. In determining whether to grant the agency permanent custody, the trial court's analysis consists of two prongs. First, the trial court must determine if any conditions enumerated

Case No. 5-09-12

in R.C. 2151.414(B)(1) are present.  R.C. 2151.414(B)(1) enumerates the

following conditions, in pertinent part:

> **(a)    The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents. * * ***
> **(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period* * *[.]**

{¶32} In determining whether the child can be placed with the child's

parents within a reasonable time or should not be placed with the child's parents,

R.C. 2151.414(E) provides, in pertinent part:

> **(E)   In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**
>
> **(1)   Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to**

-21-

**substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;**

**\* \* \***

**(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

**\* \* \***

**(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.**

**(10) The parent has abandoned the child.**

**\* \* \***

**(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to**

**prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.**

**\* \* \***

**(16) Any other factor the court considers relevant.**

**{¶33}** If the trial court finds one or more of these factors present, and thus concludes that the child cannot be placed with the child's parents within a reasonable time or should not be placed with the child's parents, the condition in R.C. 2151.414(B)(1)(a) is satisfied. If either the condition in R.C. 2151.414(B)(1)(a) or 2151.414(B)(1)(d) is satisfied, the trial court must then move on to the second prong and determine whether permanent custody is in the best interest of the child.

**{¶34}** In the second prong of its analysis, determining whether it is in the child's best interest to grant permanent custody to the agency, R.C. 2151.414(D)(1) directs the trial court to consider the following non-exclusive factors:

**(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or**

**more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151. 413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;**

**(d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

{¶35} Here, Mother contends that the trial court erred in granting permanent custody of the children to CPSU because the agency did not present clear and convincing evidence supporting its motion for custody.

{¶36} Initially, we note that Mother's argument does not dispute the trial court's determination that the children were in temporary custody of CPSU for at least twelve months of a consecutive twenty-two month period prior to CPSU filing for permanent custody pursuant to R.C. 2151.414(B)(1)(d).  Instead, Mother's arguments focus on conflicting evidence concerning her sobriety, and are impliedly geared towards the trial court's finding that the children could not or should not be returned to her within a reasonable period of time pursuant to R.C. 2151.414(B)(1)(a).  However, this Court has previously found that "when a trial court finds that R.C. 2151.414(B)(1)(d) has been met and makes a best interest determination, it is not required to also determine that the children could not or should not be returned to any of the parents within a reasonable time under R.C.

2151.414(B)(1)(a)." *In re J.P.*, 3d Dist. Nos. 5-06-52, 5-06-53, 2007-Ohio-1903, ¶93, citing *In re William S.* (1996), 75 Ohio St.3d 95, 99; *In re Lopez*, 166 Ohio App.3d 688, 2006-Ohio-2251; R.C. 2151.414(B). Thus, we need not review Mother's argument; however, in the interest of justice, we will address it briefly.

{¶37} R.C. 2151.414(B)(1)(d) provides that the first prong of analysis in determining permanent custody is satisfied where the child has been in temporary custody of the children services agency "for twelve or more months of a consecutive twenty-two-month period." Here, undisputed testimony was heard that from May 2007 until March 2009, the date of the hearing, the children were continuously in the custody of CPSU. Accordingly, as CPSU also presented testimony that granting permanent custody to CPSU was in the best interests of the children, it satisfied its burden under R.C. 2151.414(B)(1) by clear and convincing evidence. Thus, we find that the trial court did not err in granting permanent custody of the children to CPSU.

{¶38} Additionally, even though it was not required to demonstrate the presence of both conditions in R.C. 2151.414(B)(1)(a) and 2151.414(B)(1)(d), we note that CPSU presented sufficient evidence to do so. R.C. 2151.414(B)(1)(a) provides that the first prong of analysis in determining permanent custody is also satisfied if "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." Here, Mother

presented testimony from several acquaintances that she had stopped abusing drugs and testified herself that she was drug-free and had made changes in her life, including accountability and responsibility. However, testimony was also heard that, in May 2007, Mother drove in a manner that endangered the children; that Father attempted to smother B.M. while Mother was present, but Mother asked the judge to release Father from prison; that the children's progress in counseling had decreased due to their increased contact with Mother; that B.M. emphatically stated she did not want to return to Mother; that D.M. and O.M. were happy and well-adjusted in their foster homes and were agreeable to the idea of adoption; that Mother left a drug treatment facility against medical advice; that Mother only attended thirty-four out of fifty-four appointments for her mental health and substance abuse treatment; that all of Mother's drug tests were clean, but her poor attendance did not allow for regular testing; that Mother's sobriety had not been established; that Mother was at a moderate to high risk of relapse; that Mother had relapsed several times since 2000, and she admitted relapse as recent as January 2008; that Mother used marijuana multiple times in October 2008; that Mother refused a drug intervention by her Narcotics Anonymous support group; that, although Mother currently maintained a clean and orderly home, she had not maintained a safe environment for the children because she failed to adequately address her drug problem; that Mother did not even begin the life skills program as

required by the case plan; that Mother did not complete home-based therapy as required by the case plan; and, that Mother could not currently provide an adequate permanent home for the children and would not be likely to in the future. In light of this evidence, we find that the trial court did not abuse its discretion in finding that the children could not be placed with Mother within a reasonable time, and granting permanent custody to CPSU.

{¶39} Finally, based on the above evidence, we also find that the trial did not abuse its discretion in finding that granting permanent custody to CPSU was in the children's best interests.

{¶40} Accordingly, we overrule Mother's assignment of error.

{¶41} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgments of the trial court.

***Judgments Affirmed***

**PRESTON, P.J. and SHAW, J., concur.**

**/jlr**