[Cite as *In re S.L.*, 2010-Ohio-6380.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## DEFIANCE COUNTY

IN THE MATTER OF:

S. L.,                         CASE NO. 4-10-09

NEGLECTED AND DEPENDENT CHILD,

[CRYSTAL LUSK - APPELLANT].        O P I N I O N

IN THE MATTER OF:

H. L.,                         CASE NO. 4-10-10

NEGLECTED AND DEPENDENT CHILD,

[CRYSTAL LUSK - APPELLANT].        O P I N I O N

Appeals from Defiance County Common Pleas Court
Juvenile Division
Trial Court Nos. 29103 and 29102

**Judgments Affirmed**

**Date of Decision:    December 27, 2010**

Case No. 4-10-09 and 4-10-10

**APPEARANCES:**

> *Jeffrey J. Horvath* for Appellant

> *Russell R. Herman* for Appellee

**WILLAMOWSKI, P.J.**

{¶1} Mother-appellant, Crystal Lusk ("Crystal"), brings these appeals from the judgments of the Court of Common Pleas of Defiance County, Ohio, Juvenile Division, granting permanent custody of two of her children, H.L. (age four) and S.L. (age two), to the Defiance County Department of Jobs and Family Services ("the Agency"). For the reasons set forth below, the judgments are affirmed.

{¶2} In April of 2008, the Sherwood Fire Department and the Defiance County Sheriff's Office responded to a fire at the home of Margaret Roddy ("Roddy"), Crystal's mother. At the time, Crystal, H.L., S.L., Crystal's two sisters, Jamie and Stephanie Lusk, and Crystal's uncle, who had recently been released from prison, were living in the home with Roddy.[1] The fire was started in a detached garage but spread to the exterior of the home. However, the fire was extinguished with only minimal damage to the exterior of the home and no

---

[1] At this point, H.L. would have been two-years-old and S.L. would have been a few weeks old.

damage to the home's interior. Crystal and her sister, Jamie Lusk ("Jamie"), initially told the officers that they did not know how the fire started. They also did not tell the officers that Crystal's boyfriend at the time, Joe Johnson, had been at the home. However, other family members told the officers that Johnson had been there, and the officers confronted Crystal about this new information. Crystal eventually informed them that Johnson had been at the home, had started the fire in the garage, and had told her not to tell anyone that he had been there. The officers also learned that the home had no running water.

{¶3} The Agency was contacted and H.L. and S.L. were removed from the home that night. A safety plan was put in place, which included that Crystal was to have no contact with Johnson because his behavior in intentionally setting the fire posed a high threat to the children. The children were returned to Crystal the following day after the Agency learned that there was adequate bottled water in the home to care for the children, but the safety plan remained in place.

{¶4} On May 9, 2008, deputies responded to a call at the Defiance Mall, where they learned that Johnson had assaulted Crystal. They also learned that Crystal had gone to the mall after arguing with Jamie and Roddy about how she spent her money, in particular that she spent some of her money to pay for a motel room for Johnson although the two were not to have any contact with one another according to the safety plan. The Agency was informed of this incident, and on

May 12, 2008, another safety plan was created whereby Crystal agreed to leave her children with Roddy while she stayed with a friend in order to assure that the children would not be exposed to any violence between the couple.

{¶5} On June 9, 2008, Johnson attacked Crystal with a knife when she came to his home to retrieve some personal property. During this incident, Johnson repeatedly hit Crystal and swung a knife at her several times, resulting in multiple cuts to her arms. Crystal was taken to a nearby hospital while law enforcement attempted to locate Johnson. While at the hospital, Crystal revealed that Johnson had threatened to kill her and her entire family. Johnson was located several hours later, arrested, and charged with felonious assault.[2]

{¶6} The Agency was contacted about this incident the following day but was unaware at the time of Johnson's arrest. The Agency obtained an ex parte order from the trial court placing the children in its emergency temporary custody. The children were removed from the home and placed in foster care. The following day a shelter care hearing was held, and Crystal attended. Crystal elected to proceed without counsel, and the Agency was granted emergency temporary custody of the children.

{¶7} On June 25, 2008, the Agency filed a complaint for each of the

---

[2] Johnson was later indicted on three counts. As a result of a plea agreement, he pled guilty to felonious assault and abduction. For these offenses, Johnson received an aggregate sentence of nine years in prison. (See Perm. Cust. Hrg. Trans., 4/28/10, pp. 29-30.)

children. The complaints alleged that the children were neglected because they were not receiving proper parental care due to the faults or habits of their mother who was in an abusive relationship resulting in physical harm to her and she was not budgeting properly to maintain a home and utilities for the children. The complaints further alleged that the children were dependent because their condition or environment was placing them at risk due to Crystal's violent relationship and her inability to maintain a home and meet the children's needs because she was irresponsible with her finances.

{¶8} On July 8, 2008, an initial hearing was held on the complaints. Both Crystal and S.L.'s father, Matthew Reiman, were present and entered pleas of "not true" to the allegations contained in the complaints.[3] At this time, the trial court appointed a guardian ad litem for the children and set a date for adjudication.

{¶9} In August of 2008, the adjudicatory hearing was held. Crystal withdrew her previously tendered pleas of "not true" and entered pleas of "true" to the allegations of neglect and dependency as to both H.L. and S.L.[4] Given the allegations contained in the complaints and Crystal's admissions, the court found that H.L. and S.L. were neglected and dependent and proceeded to disposition.

---

[3] Although S.L.'s father attended a few of the initial hearings and visited with S.L. on a few occasions in the early stages of the Agency's temporary custody, by the time of the permanent custody hearing, the father no longer had contact with S.L. or the Agency and was no longer attending hearings despite being properly notified. In addition, the record indicates that the name and address of H.L.'s father were unknown and were never discovered throughout these proceedings.

[4] Although the trial court's entry reflects that Reiman was present, it is silent as to whether he also changed his plea to the allegations of dependency and neglect to "true." In any event, this is not an issue before us.

The court granted temporary custody of the children to the Agency and adopted the case plans for the children that were filed by the Agency. The judgment entry reflecting these proceedings was filed on September 29, 2008.

{¶10} Although the children were placed in foster care in June of 2008, Crystal and her mother and sisters were allowed supervised visits with the children. Initially, H.L. was very emotional and distraught when visitations with her mother and grandmother would end. As a result, the Agency worked with the foster parents to add additional visits outside of the Agency to lessen the trauma of separation for H.L. This arrangement continued after the children were placed in another foster home on September 9, 2008,[5] and even after H.L. had adjusted to the situation. Many of these visits occurred at the church of the second foster family on Wednesdays and Sundays.

{¶11} According to Tosha Burkley, the family's on-going caseworker, Crystal did very well in complying with the case plan during the first few months that the children were in foster care. She regularly visited with the children, obtained her own apartment at the Degler Apartments, contacted the Social Security Administration to learn whether she could be employed and continue to receive her disability payments (she had some cognitive problems due to lead

---

[5] The children were removed from their first foster family because the foster mother was injured and unable to continue to care for the children.

poisoning as a child), and was cooperative with the Agency. As a result, the Agency decided that extended, unsupervised visitations, including overnight visitations, would be appropriate.

{¶12} Crystal's first overnight visitation with the children occurred on September 23, 2008. However, three days later, Burkley discovered that Crystal was smoking marijuana. In addition, Burkley learned that during one of the unsupervised visits, H.L. was at her grandmother's apartment (Roddy moved into the same apartment complex as Crystal) when she found a camera and placed it in the microwave, causing it to explode. Burkley also learned that there were times during these visits when the children would be with Roddy or other family members rather than with Crystal. Due to these issues, particularly the marijuana usage, the Agency suspended all overnight and unsupervised visits. The Agency also filed a motion requesting that Crystal be subjected to drug testing.

{¶13} From October of 2008 until January of 2009, Crystal tested positive for marijuana. During this time, Burkley noticed that Crystal repeatedly missed her required therapy appointments and also missed appointments for drug testing. On January 21, 2009, Burkley received a report that Crystal was discharged from her counseling with Lori Price-Hull, who she was seeing to learn about the danger of bringing unsafe men into her life and the negative impact that could have on the children, to learn how to properly parent her children, to address budgeting issues,

and to learn to live independently from her mother because of Roddy's lengthy history with various children services agencies during Crystal's childhood. Crystal was discharged from this service due to being late and missing several appointments. Burkley also learned that Crystal was in a relationship with a man named Lewis, who had a history of domestic violence, and that Crystal had called the police when Lewis would not return a cell phone that she had purchased for him. Nevertheless, Burkley believed Crystal was still cooperative, open to changing her life, and that reunification between mother and children was quite possible.

{¶14} At the semi-annual review at the Agency in February of 2009, several concerns were discussed, Crystal was receptive to the amendment of the case plans to address these concerns, and she expressed that she did not want to discuss a contingency plan of relative placement because she wanted to complete the objectives of the case plans and be reunified with her children. Shortly after this review, the children were assigned a new caseworker, Julia Santiago. The amended case plan was adopted by the trial court on February 19, 2009.

{¶15} The amendments to the case plans in February of 2009 required Crystal to have a drug and alcohol assessment and follow any recommendations from that assessment. However, Crystal did not complete this assessment until several months later. Santiago testified that in addition to her marijuana usage,

Crystal took some pills, Vicodin and Percocet, that a friend had given her. Crystal had her first "clean" drug screen in April of 2009, and she did not test positive for any drugs or report taking any other drugs after this time.

{¶16} When Julia Santiago became the caseworker in February of 2009, Crystal returned to counseling with a new therapist, Frank Sanders, to address the issues that Price-Hull had previously attempted to address with her. By May of 2009, Crystal appeared to be making progress on the case plan again, but she had not completed its objectives. On May 18, 2009, the Agency filed motions with the trial court to extend its temporary custody of the children in order to allow Crystal more time to complete the objectives of the case plan. On June 17, 2009, the trial court held an annual review hearing in these cases, and at that time, Crystal agreed with the extension of temporary custody. The trial court granted the requests, which resulted in temporary custody being extended until December 10, 2009.

{¶17} While receiving counseling from Sanders, Crystal missed several appointments and was ultimately discharged by Sanders because of these absences. Crystal was transferred to a different therapist, Ann Clark, in July of 2009. That month, Crystal was also evaluated by Barbara Florke, a clinical nurse specialist in psychiatry at the Maumee Valley Guidance Center, in order to determine whether she was in need of any medications for mental health issues. Florke evaluated Crystal to determine whether she had a psychiatric illness and

whether she would require medication. Florke's impressions were that Crystal suffered from post-traumatic stress disorder. She also thought that Crystal might possibly be suffering from bi-polar disorder and that there was a possibility of a cognitive disorder secondary to lead poisoning as a child. However, she did not prescribe any medications for Crystal because Crystal was now pregnant with her third child. Florke recommended that Crystal undergo a psychiatric evaluation and also recommended that she undergo psychological testing to determine what, if any, cognitive disorders she may have.

{¶18} In August of 2009, Santiago was able to establish in-home counseling for Crystal in an effort to alleviate Crystal's attendance problems. Thus, Crystal's counseling with Clark ceased, and Diana Owens came to Crystal's home to counsel her on the issues that Price-Hull and Sanders had previously attempted to address. Although the counseling occurred in Crystal's home, she cancelled a number of appointments with Owens. In addition, she did not actively participate in this counseling. She would not discuss her choices in men, would refuse to converse with Owens whenever Owens would question her judgment on a particular matter such as budgeting, and had an overall flat affect when speaking to Owens.

{¶19} By December of 2009, the Agency saw very little progress in Crystal's behavior and thinking. She did not successfully complete counseling or

seem to make any progress in counseling. She was unable to maintain housing, having moved four times during the pendency of these cases, including moving back in with her mother and sisters. She had failed to obtain part-time employment[6] and continued to choose relationships with men who had histories of domestic violence or other criminal conduct. In addition, Crystal had not participated in any form of drug and/or alcohol counseling, and the children had been in foster care for eighteen months. Consequently, on December 10, 2009, the Agency filed for permanent custody of the children.

{¶20} On January 27, 2010, an attorney was appointed to represent Crystal. On February 3, 2010, a hearing was held in this matter, and the parties stipulated that it was in the children's best interests that they remain in the Agency's temporary custody until the permanent custody motions were determined.

{¶21} In January and February of 2010, Crystal participated in a six week early treatment group for drugs and alcohol, having completed her drug and alcohol assessment the previous November. Crystal gave birth to her third child, A.L., on March 1, 2010, and in order to receive her prescriptions, returned to Florke later that month as Florke had advised her to do when she conducted a psychiatric evaluation on Crystal the previous December. Florke prescribed Crystal an anti-depressant medication and a mild anxiety medication. Crystal

---

[6] According to Crystal, she was able to work twenty hours a week and still continue to receive her Social Security income.

returned to the center where Florke worked the next month and reported to the nurse who saw her that day that she was sleeping better, had more energy, and her thoughts were more organized.

**{¶22}** Owens stopped her counseling sessions with Crystal in March of 2010, because she did not believe that there was anything more she could accomplish with Crystal. On April 6, 2010, Jamie Lusk filed motions requesting that she be given legal custody of H.L. and S.L. On April 23, 2010, the guardian ad litem filed her reports and recommendations in which she recommended that the Agency be granted permanent custody of the children.

**{¶23}** The permanent custody hearing was held on April 28-29, 2010. The State presented a number of witnesses, including the caseworkers, Price-Hull, Owens, and the current foster father. Crystal presented three witnesses, including Jamie Lusk. Jamie did not present any witnesses. On July 2, 2010, the trial court granted the Agency's requests for permanent custody of H.L. and S.L.

**{¶24}** Crystal now appeals these decisions, raising six assignments of error.

### FIRST ASSIGNMENT OF ERROR

**THE TRIAL COURT'S FINDING OF PERMANENT CUSTODY WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**SECOND ASSIGNMENT OF ERROR**

**THE TRIAL COURT ABUSED ITS DISCRETION BY REFUSING TO EXTEND TEMPORARY CUSTODY IN LIEU OF GRANTING THE STATE'S MOTION FOR PERMANENT CUSTODY.**

**THIRD ASSIGNMENT OF ERROR**

**THE TRIAL COURT ERRED BY FINDING THAT DCDJFS HAD MADE SUFFICIENT EFFORTS REGARDING RELATIVE PLACEMENT.**

**FOURTH ASSIGNMENT OF ERROR**

**THE TRIAL COURT DENIED APPELLANT DUE PROCESS BY NOT APPOINTING COUNSEL UNTIL AFTER FILING OF THE STATE'S MOTION FOR PERMANENT CUSTODY.**

**FIFTH ASSIGNMENT OF ERROR**

**THE TRIAL COURT ERRED BY FINDING THAT DCDJFS MADE REASONABLE EFFORTS TO ALLOW FOR THE RETURN OF THE CHILDREN TO APPELLANT.**

**SIXTH ASSIGNMENT OF ERROR**

**THE TRIAL COURT DID NOT SPECIFICALLY ADDRESS OR IN THE ALTERNATIVE CONSIDER THE SPECIFIC FACTORS LISTED IN R.C. 2151.414(D).**

{¶25} For ease of discussion, we elect to address these assignments of error out of the order in which they appear and to address some of them together as they are interrelated.

{¶26} Our review of all of these assignments of error begins by noting that the right to raise one's own child is a basic and essential civil right. *In re Murray*

-13-

(1990), 52 Ohio St.3d 155. "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3rd Dist. No. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶ 6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. *Id*.

*First and Sixth Assignments of Error*

**{¶27}** In Crystal's first assignment of error, she maintains that the trial court's determination that permanent custody of H.L. and S.L. should be granted to the Agency was not supported by clear and convincing evidence and was against the manifest weight of the evidence. In her sixth assignment of error, she contends that the trial court erred in awarding permanent custody of the children to the Agency because it did not specifically address or even consider the factors enumerated in R.C. 2151.414(D), which it is required to consider when determining whether permanent custody to the Agency is in a child's best interest.

**{¶28}** When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. These requirements include in pertinent part as follows.

> **the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply: * * * (d) The child has been in**

> **the temporary custody of one or more public children services agencies \* \* \* for twelve or more months of a consecutive twenty-two month period[.]**

R.C. 2151.414(B)(1).

**{¶29}** The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford* (1954), 161 Ohio St. 469, 477. Further, "[i]t is intermediate; being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Id.*, citing *Merrick v. Ditzler* (1915), 91 Ohio St. 256. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross*, supra (citations omitted); see, also, *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368. Thus, we are required to determine whether the evidence was sufficient for the trial court to make its findings by a clear and convincing degree of proof.

**{¶30}** Here, the parties stipulated and the trial court found that the children had been in the temporary custody of the Agency for twelve or more months of the prior twenty-two consecutive months pursuant to R.C. 2151.414(B)(1)(d). As

previously noted, the children were removed from Crystal's home on June 10, 2008, and were adjudicated dependent on September 29, 2008. For the purposes of R.C. 2151.414(B)(1)(d), "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty (60) days after the removal of the child from the home." R.C. 2151.414(B)(1)(d). As of August 9, 2008, the children had been out of the home for sixty days. The motions for permanent custody were filed on December 10, 2009. Thus, pursuant to the statute, the children had been in the temporary custody of the Agency for sixteen consecutive months, and the trial court's determination in this regard was clearly supported by the evidence.

{¶31} Once this finding was made, the trial court needed only to find that permanent custody to the Agency was in the children's best interests. See *In re C. W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, at ¶ 21. In order to determine whether granting permanent custody to an agency is in a child's best interest, the trial court must consider all relevant factors, including, but not limited to, five enumerated factors. R.C. 2151.414(D). Further, "the trial court must either specifically address each of the required considerations set forth in R.C. 2151.414(D) in its judgment entry, or otherwise provide some affirmative indication in the record that the court has considered the specific factors listed in R.C. 2151.414(D)." *In re*

*D.H.*, 3rd Dist. No. 9-06-57, 2007-Ohio-1762, at ¶ 21. "[It] is not sufficient for the trial court to simply rely on the appellate court to review the factual record or narrative and then make the necessary inferences to determine whether the trial court must have considered each of the required statutory factors." *Id*. at ¶ 20. These enumerated factors are

> **(a)   The interaction and interrelationship of the child with the child's parent, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(b)   The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(c)   The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *;**
>
> **(d)   The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**
>
> **(e)   Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

R.C. 2151.414(D)(1)(a-e)

{¶32} Crystal contends that the trial court did not address or consider the required factors in determining whether granting permanent custody to the Agency was in the children's best interest. We find this contention to be without merit.

{¶33} The trial court found that granting permanent custody of H.L. and S.L. was in their best interests. In so doing, the trial court specifically noted that this finding was made pursuant to R.C. 2151.414(D). Further, as previously discussed, the trial court considered the custodial history of the children, finding that they had been in the temporary custody of the Agency twelve or more months of a consecutive twenty-two month period. See R.C. 2151.414(D)(1)(c). The trial court's entry further reflects that it considered the interactions and interrelationships between the children, their mother, the grandmother and aunts, and foster care providers (R.C. 2151.414(D)(1)(a)); the wishes of the children as expressed through their guardian ad litem, who recommended that the Agency be granted permanent custody (R.C. 2151.414(D)(1)(b)); their need for legally secure placement (R.C. 2151.414(D)(1)(d)); and made no findings that the factors in R.C. 2151.414(E)(7) to (11) applied (R.C. 2151.414(D)(1)(e)). Accordingly, contrary to Crystal's assertions, we find that the trial court not only stated in its judgment entry that it considered R.C. 2151.414(D) in determining the children's best interests but that it specifically referred to each factor in that section. Therefore, the sixth assignment of error is overruled.

{¶34} The next question is whether there was clear and convincing evidence for the trial court to find that permanent custody to the Agency was in the children's best interests. For the following reasons, we find that there was.

{¶35} The children were initially removed from Crystal's care because she was in an abusive relationship with a man who eventually assaulted her with a knife and threatened to kill her and her children. In addition, Crystal was unable to maintain a home independent of her mother and meet the children's needs due to her irresponsibility with finances and inability to properly budget.

{¶36} To address the safety concerns, the case plan required Crystal to participate in counseling to learn to make better personal choices, to learn how her choices affect her children, and to learn how to make choices that did not present safety risks for the children. As previously noted, Crystal began counseling but was only intermittently compliant and was discharged by two different counselors when she repeatedly missed appointments. Crystal received additional counseling in her home by Owens, who also terminated services after Crystal made no progress and neglected to actively participate in counseling.

{¶37} Owens testified that she found Crystal to have a very flat affect and that she would "shut down" whenever Owens questioned her judgment in particular areas, such as how she could afford a certain apartment she wanted and be able to manage obtaining other necessary items, such as diapers, utilities, etc. Often times Crystal would cease talking to Owens and not respond when asked direct questions. Additionally, Crystal would usually not interact with Owens and informed Owens that she did not trust therapists, only trusted her family, and did

not believe anyone had a right to tell her what to do, including how to parent her children. She also did not want to discuss the men she had been involved with despite Owens advising her that they needed to have this type of discussion in order to prevent her from entering future violent relationships.

{¶38} Due to her unwillingness to engage with Owens, Owens was only able to provide Crystal with information about domestic violence, the cycle of violence, and characteristics of battering personalities but could not have *conversations* with Crystal about these issues. During the time period in which Owens counseled Crystal, Crystal cancelled her appointments with Owens on several occasions. By March of 2010, Owens discontinued her counseling with Crystal because she did not believe that she could provide any further assistance to Crystal due to her lack of participation and mistrust. Owens also testified that she could not identify any progress on Crystal's part because of the fact that Crystal never interacted with her.

{¶39} Despite what counseling Crystal did receive, she continued to make poor decisions in regards to the men with whom she became romantically involved even after Johnson was sentenced to prison. Among these men was a person who she knew as "G" but did not know his real name or anything about his background and another man who was homeless. There was also Lewis, a man with a history of domestic violence who refused to return a cell phone to her that she purchased,

prompting her to seek police assistance. Then, she became involved with the father of her third child, a man she met on the internet, who was back living in Dayton, Ohio, and no longer involved with Crystal by the time Owens began counseling her in August of 2009. Most recently, she was dating a man by the name of Travis, who Santiago testified was not allowed to see his own children because of sex abuse issues arising out of another county, who had sexually abused younger children when he was a teenager, and who had a history of domestic violence.

{¶40} Crystal was also never able to *maintain* stable housing on her own, having moved four times throughout the pendency of these proceedings. Even when she lived with her mother and sisters, the whole family moved repeatedly, often having been evicted for non-payment of rent despite having Crystal's income from social security, her mother's income either from working or receiving unemployment compensation, and her sister Jamie's income from working. Santiago also testified that the places Crystal lived were often messy, including times when she was "pet sitting" and there would be pet excrement on the floor.

{¶41} Her home at the time of the permanent custody hearing was a two bedroom apartment, which she shared with her mother and two sisters. If the children were allowed to return to her care, Crystal's plan was to have each of the

children share a bedroom with her sisters, and she and her mother would continue to sleep in the living room. The Agency was particularly concerned about Crystal's reliance on her family to support her and the children because the Roddy/Lusk family had a lengthy history with children services agencies, including Lucas, Putnam, Paulding, Williams, and Defiance counties, as far back as 1988, involving several substantiated neglect cases and physical and sexual abuse cases. Thus, the Agency stressed the need for Crystal to stop relying on her family as a housing source.

{¶42} In addition, Owens testified that the small apartment would not adequately house four adults and potentially three children if all of Crystal's children were returned to her. Further, Owens noted that in her time working with Crystal, the condition of the apartment worsened. Santiago also testified about visiting the apartment on multiple occasions, when Crystal knew in advance that she would be visiting, and there would be dirty dishes everywhere, food left on the table, clutter throughout, and the apartment would smell heavily of cigarette smoke.

{¶43} Crystal was also not capable of handling her finances and switched payees for her social security income three different times. In fact, she did not know how much money she had and neither did her most recent payee, Jamie. Crystal was referred to the Ability Center by Price-Hull so that she could learn

how to handle her finances and properly budget. In addition, her caseworkers discussed the importance of *properly* spending and saving her money in order to meet the children's basic need for a home with working utilities if Crystal wanted to be reunited with them. Likewise, Owens counseled Crystal about her finances, how to budget for a home, utilities, and other necessities for raising two small children. Nevertheless, rather than saving her money in order to be able to live independently from her mother and sisters and provide for her children, Crystal often bought the children many presents and snacks to give them when she visited. Notably, H.L. had numerous dental problems of which Crystal was aware, yet she often brought candy or cookies to the children and allowed H.L. to eat significant amounts of these snacks. It was not until the case worker would point out to Crystal that these types of treats were not appropriate given H.L.'s dental health that Crystal would stop H.L.'s consumption of these sugary treats.

{¶44} The evidence also revealed that Crystal regularly visited with the children and rarely missed a visitation, including the additional visits at the foster family's church. When visiting with both children, particularly as S.L. grew and became more physically active, Crystal had difficulty in handling both of them and was overwhelmed when her third child was born and was added to the visitation. In fact, the Agency adjusted the visits with the children to have the first half hour involve only Crystal, H.L. and S.L., the second half hour would be with

all three children, and the third half hour would only be between Crystal and the new baby to make it easier for Crystal to manage.

{¶45} Owens testified that she observed various visits between Crystal, H.L., and S.L. She testified that Crystal was unable to watch both children adequately and did not think to change her location in the room so that she could observe the whole room and where her children were located at all times to ensure that they did not play with toys that were dangerous for each child's respective stage of development until Owens showed her where to sit. Crystal also brought toys that were too advanced for her children's ages, resulting in frustration and acting out by H.L. Owens further testified that she did not believe that Crystal could handle raising small children, who demand a lot of attention, manage to stay calm, "keep a roof over their head, [and] pay her bills," and that additional time would not change this. (Hrg., 4/29/10, p. 172.) Owens also was concerned because in speaking with Crystal she realized that when Crystal is involved with a man, the man is very important to her and whatever that man may ask of her she will give. The guardian ad litem also reported that Crystal did not appropriately discipline the children, often failing to follow through with her chosen form of discipline, not explaining the discipline to the children, or simply ignoring the misbehavior of the children.

{¶46} Although H.L. and S.L. were happy to visit with their mother and their relatives, the guardian ad litem reported that they were more strongly bonded to the foster parents. Notably, by the time of the permanent custody hearing, the children, who had turned four and two, respectively, the proceeding month, had been together in foster care for twenty-two consecutive months and with the same foster family for over nineteen consecutive months. During their time in the foster family's care, H.L. and S.L. were cared for, their needs were met, including H.L.'s dental problems, and they were thriving.

{¶47} In short, although Crystal accomplished some of the case plan objectives, such as regular visitation, no longer using marijuana, and completing substance abuse counseling, she did not successfully complete the remainder of the case plan objectives and she did not implement the counseling she received. Crystal's compliance with the case plan was intermittent. She would have periods of seeming compliance, but then she would revert to her previous ways. Despite having nearly two years to complete the objectives of the case plan, she did not complete the objectives of the case plan that were of the most importance in having her children returned to her, i.e. demonstrating that she could make choices that would not jeopardize her children's safety and that would ensure their basic needs were met. Further, there was no evidence before the trial court that Crystal was ever going to accomplish these objectives. To the contrary, Crystal

demonstrated a pattern of behavior throughout the pendency of these cases that indicated she would not change her way of thinking or acting, which would continue to place the children at risk if they were returned to her care.

{¶48} As for the children, while in the Agency's care, they were safe, their needs were met, they were well adjusted, and the evidence revealed that they would continue to be in this condition if the Agency was given permanent custody of them. Further, the current foster parents were quite bonded with the children and were willing to adopt both children. In addition, the guardian ad litem, who spoke with many people involved with the children, observed the children with their mother and with the foster family, reviewed records from Crystal's counseling sessions, and was involved in these proceedings throughout, recommended that the Agency be granted permanent custody. In light of all of the evidence, the trial court's determination that permanent custody to the Agency was in the children's best interest was amply supported, and the first assignment of error is overruled.

*Fifth Assignment of Error*

{¶49} In her fifth assignment of error, Crystal asserts that the trial court erred in finding that the Agency made reasonable efforts to return the children to her. The Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has

removed the children from the home. R.C. 2151.419; see, also, *In re Brown* (1994), 98 Ohio App.3d 337, 344, 648 N.E.2d 576. Further, the agency bears the burden of showing that it made reasonable efforts. R.C. 2151.419(A)(1). "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated." *In re Evans*, 3rd Dist. No. 1-01-75, 2001-Ohio-2302. To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification. *Id.* Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan. *Id.* "Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case." *In re Leveck*, 3rd Dist. Nos. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, at ¶ 10.

{¶50} As previously noted, the two major concerns of the Agency were that Crystal not continue to make choices that placed her children's safety at risk and that she provide for their basic needs without relying on Roddy, who had a lengthy history with children services agencies. To those ends, the case plan required that Crystal participate in counseling, that she participate in parenting classes, and that she obtain and maintain suitable housing of her own rather than with her mother. In order to accomplish the goal of maintaining her own housing,

Crystal was to obtain gainful employment in order to be able to have an adequate income to afford housing. When the Agency discovered that Crystal was smoking marijuana, the case plan was amended to require her to submit to a drug and alcohol assessment and comply with any services recommended as a result.

{¶51} In order to accomplish the objectives of the case plan, the Agency was to provide Crystal with referrals to counseling agencies for a mental health evaluation, drug and alcohol assessment, and counseling, a referral to Help Me Grow (a parental education resource), a referral to the Ability Center for help with budgeting, transportation if needed, and with case management, including routine home visits and case reviews every ninety days to review her progress and intervene if necessary. Crystal was also to contact the OSU Extension for classes on budgeting/household maintenance and to utilize the Northwest Ohio Job Center for help in applying and securing employment. The case plan also required visitation between Crystal and the children, and the Agency was required to facilitate this visitation.

{¶52} Crystal reviewed the case plan with the Agency on multiple occasions, including at the semi-annual reviews. Her caseworkers explained the plan to her and emphasized the importance of completing the plan's objectives in order to be reunified with her children. The Agency made all the required referrals and took additional steps to ensure that Crystal received the necessary

counseling by having a counselor come directly to Crystal's home in an effort to alleviate her attendance problems. The Agency also made a request and a referral to the furniture bank when Crystal asked for the Agency's assistance in obtaining furniture. The caseworkers made regular visits to her home and discussed various issues with her that needed to be addressed. The Agency scheduled visitation with Crystal and her children and even established additional visitation through the foster family to ease the trauma H.L. initially experienced.

{¶53} When Burkley thought that Crystal was making good progress on the case plan, the Agency extended her visitation to unsupervised visits, including overnight visitation. However, H.L. managed to cause a camera to explode in the microwave during one of these visits, and the Agency learned that Crystal was smoking marijuana. Only then did these visits cease. Nevertheless, the Agency, through the foster family, continued to provide additional visits for Crystal on Wednesdays and Sundays at the foster family's church, including permitting Crystal to have a birthday party for one of the children. In addition, the Agency requested and received a six-month extension to allow Crystal more time to complete the objectives of the case plan.

{¶54} Despite these efforts by the Agency, Crystal now asserts that the Agency did nothing to assist her in obtaining employment, to register for on-line classes, to find a new home, or to obtain necessary medication. Although the

evidence does not indicate that the Agency provided a list of available housing when Crystal moved from the Degler apartment, the employment classifieds, or a how-to-manual for on-line class registration, the case plan, itself, included the names of resources where she could find this information. Further, the record is devoid of any evidence that Crystal could not manage to obtain this information utilizing these resources or that she ever requested additional assistance from the Agency.

{¶55} As for the issue of medication, Crystal was evaluated on multiple occasions for mental health concerns because she repeatedly was discharged from counseling because of poor attendance. Consequently, it was not until July of 2009 that she was able to be examined by Florke for the purpose of determining whether she needed medication. At that time, Florke could not medicate Crystal because Crystal was pregnant. Thus, the delay in being provided with the necessary medications was due to Crystal's actions not those of the Agency.

{¶56} As noted, the Revised Code only requires that the Agency's case planning and efforts be reasonable and diligent under the circumstances of these cases. The Revised Code does not require that an Agency walk a parent through every step of the plan; the parent bears some of the responsibility for accomplishing the objectives of the case plan. In light of the issues involved in these cases and the efforts made by the Agency to reunify Crystal with her

children, we cannot conclude that the trial court erred in finding that the case planning and efforts of the Agency were reasonable and diligent. Therefore, the fifth assignment of error is overruled.

*Second Assignment of Error*

**{¶57}** In her second assignment of error, Crystal asserts that the trial court abused its discretion in denying her request for an extension of temporary custody rather than granting permanent custody to the Agency. In support of this assertion, Crystal contends that Florke testified that she prescribed medications for Crystal in March of 2010, that by April of 2010, Crystal was responding to these medications, and that the trial court should have allowed Crystal more time to "see if Crystal could continue the progress she was making." However, Crystal has cited to no authority, and this Court is not aware of any requirement, that the trial court allow a parent more time before granting permanent custody to the Agency.

**{¶58}** Here, the children had been in the physical custody of the Agency for twenty-two months. As we have previously held, the best interests of children include not having to linger in foster care awaiting their mother to become a responsible parent. See *In re Gomer*, 3rd Dist. Nos. 16-03-19, 16-03-20, 16-03-21, 2004-Ohio-1723, at ¶ 27. In addition, there was no evidence before the trial court that Crystal would continue to take her prescriptions or that these medications would result in Crystal achieving the objectives of the case plan. However, there

was evidence that Crystal vacillated in her compliance with the case plan, engaging in cycles of compliance and non-compliance. Thus, concluding that this medication would have some curative effect for Crystal's poor decision-making and lack of compliance is pure speculation. More importantly, given our discussion in regards to the first and sixth assignments of error that the trial court properly followed the mandates of R.C. 2151.414 before granting permanent custody to the Agency, we conclude that the trial court did not err in denying Crystal's request for an extension of permanent custody. The second assignment of error is overruled.

*Third Assignment of Error*

{¶59} Crystal maintains in her third assignment of error that the trial court erred in finding that the Agency made sufficient efforts to place the children with a relative. More specifically, Crystal asserts that R.C. 2151.28 requires that a trial court determine whether there are any relatives of the child who are willing to be temporary custodians of the child and that the children could have been placed with her sister Jamie.

{¶60} Although Crystal correctly notes that R.C. 2151.28 requires a trial court to determine whether there are any relatives who are willing to be temporary custodians of the child, her reliance on this portion of the Revised Code is misplaced. This determination is to be made at the time the trial court makes its

shelter care determination during the adjudicatory hearing and is only in effect until the dispositional hearing. See R.C. 2151.28(B)(1); 2151.353(A).[7] There is no similar requirement when a trial court is deciding whether to grant an agency's request for permanent custody. See *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, at ¶ 64; R.C. 2151.414.

{¶61} Further, Jamie made no representations that she wanted to take custody of the children until four months after the Agency filed for permanent custody despite the fact that the children had been in foster care for nearly twenty-two months. The evidence also revealed that she currently lived with Crystal, their mother, and another sister in the two bedroom apartment at Castle Court; she had always lived with her mother and was evicted for non-payment of rent along with her family although she was employed, her mother received unemployment compensation and/or was employed, and Crystal received social security income; and she worked third shift, did not have a driver's license, and did not know how she would arrange transportation to have someone care for the children while she was working. Thus, the trial court did not err by denying Jamie's motion for legal custody, and the third assignment of error is overruled.

---

[7] A similar provision also appears in R.C. 2151.314(B)(2).

*Fourth Assignment of Error*

**{¶62}** Crystal contends in her fourth assignment of error that the trial court denied her due process by not appointing her counsel until the Agency filed its motions for permanent custody. The Revised Code provides that a parent "is entitled to representation by legal counsel at all stages of the proceedings" under Chapter 2151., including the right to have counsel appointed if the parent is indigent. R.C. 2151.352; see, also, Juv.R. 4. However, a parent can also waive this right. See *In re Ramsey Children* (1995), 102 Ohio App.3d 168, 169-170, 656 N.E.2d 1311.

**{¶63}** Crystal contends that she requested counsel at the shelter care hearing. In support of this, she relies upon the trial court's entry of June 25, 2008, which noted that the court had informed Crystal of her right to an attorney but that she waived her right to counsel for purposes of that hearing, requested that the matter proceed, and requested "counsel be appointed for future proceedings." (Judg. Ent., 6/25/08.) However, there is nothing in the record to indicate that Crystal filed an affidavit of indigency in order to have the court appoint an attorney for her, and there is no transcript before this Court of the shelter care hearing to further explain the "request for counsel for future proceedings" or to demonstrate that Crystal qualified for court appointed counsel.

{¶64} Moreover, the trial court's entries for the July 8, 2008 hearing, wherein Crystal denied the allegations contained in the complaints, and the August 21, 2008 adjudicatory and dispositional hearings, wherein Crystal admitted the allegations of neglect and dependency were true, note that the trial court advised Crystal of her right to an attorney but that she waived this right and elected to proceed on both occasions. (See Judg. Ent., 7/14/08; Judg. Ent., 9/29/08.) Crystal provided no transcript of these hearings either. Accordingly, we presume the regularity of the proceedings and that the trial court accurately reflected in its judgment entries what occurred at these hearings. See *In re Predmore*, 187 Ohio App.3d 100, 2010-Ohio-1626, 931 N.E.2d 181, at ¶ 35, citing *State v. West*, 3rd Dist. No. 2-06-04, 2006-Ohio-5834, ¶¶ 51, 53; App.R. 9(B). Therefore, the record does not demonstrate that Crystal was denied her right to counsel prior to the motions for permanent custody but that she did not pursue it. The fourth assignment of error is overruled.

{¶65} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgments of the trial court.

***Judgments Affirmed***

**ROGERS and PRESTON, J.J., concur.**

**/jlr**

Case No. 4-10-09 and 4-10-10