[Cite as *In re Jo.S.*, 2011-Ohio-6017.]

## IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### HANCOCK COUNTY

IN THE MATTER OF:

    JO. S.,                               CASE NO. 5-11-16

ALLEGED ABUSED, NEGLECTED
AND/OR DEPENDENT CHILD,

[JOSEPH SALDANA –
      APPELLANT/FATHER],                O P I N I O N
[TRACY PARDO –
      APPELLANT/MOTHER].

IN THE MATTER OF:

    JA. S.,                                CASE NO. 5-11-17

ALLEGED ABUSED, NEGLECTED
AND/OR DEPENDENT CHILD,

[JOSEPH SALDANA –
      APPELLANT/FATHER],                O P I N I O N
[TRACY PARDO –
      APPELLANT/MOTHER].

**Appeals from Hancock County Common Pleas Court,
Juvenile Division
Trial Court Nos. 20930053 and 20930054**

**Judgments Affirmed**

**Date of Decision: November 21, 2011**

APPEARANCES:

*Charles R. Hall, Jr.* for Appellant, Joseph Saldana

*Nicole M. Winget* for Appellant, Tracy Pardo

*Benjamin E. Hall* for Appellee, CPSU

*Drew Mihalik* for CASA

**ROGERS, P.J.**

{¶1} Father-Appellant, Joseph Saldana (hereinafter "Joseph"), and Mother-Appellant, Tracy Pardo (hereinafter "Tracy"), separately appeal the judgments of the Court of Common Pleas of Hancock County, Juvenile Division, terminating their parental rights and granting permanent custody of their children, Jo.S. and Ja.S. (collectively "children"), to the Hancock County Job and Family Services, Children Protective Services Unit (hereinafter "CPSU").

{¶2} On appeal, Joseph contends that CPSU failed to make reasonable efforts to reunite the children with him; that the trial court's judgments granting CPSU permanent custody of the children were against the manifest weight of the evidence; that granting permanent custody of the children to CPSU was not in the children's best interest; and, that CPSU did not make a good faith effort to reunite him with his children. In her appeal, Tracy contends that the trial court's judgments granting CPSU permanent custody of the children were against the manifest weight of the evidence; that granting permanent custody of the children

to CPSU was not in the children's best interest; and, that CPSU failed to make reasonable efforts to reunite her with her children. Based on the following, we affirm the judgments of the trial court as to both Joseph and Tracy.

{¶3} On December 14, 2009, Jo.S. was admitted to Blanchard Valley Hospital with a fever and a red, swollen left eye. CAT scans of Jo.S.'s eye revealed that he had a broken left orbital bone. The examining physician attributed the injury to child abuse. On December 18, 2009, CPSU filed two complaints: one alleging that Jo.S. was a neglected, abused, and dependent child as defined by R.C. 2151.03, R.C. 2151.031, and R.C. 2151.04, respectively; the other alleging that Ja.S. was a neglected, dependent child as defined by R.C. 2151.03 and R.C. 2151.04, respectively. Additionally, CPSU moved the trial court for an emergency ex parte order requesting that the children be placed in the temporary custody of Rosalinda Garcia (hereinafter "Garcia"), the children's paternal grandmother, which the trial court granted.

{¶4} On December 22, 2009, the matter proceeded to a shelter care hearing. The trial court concluded that probable cause existed for the filing of the ex parte order, and that the children's continued residence in either Joseph's or Tracy's (collectively "parents") custody would be contrary to the children's best interest. Based on CPSU's recommendation, the trial court ordered that the children remain in Garcia's emergency temporary custody.

**{¶5}** On January 25, 2010, the trial court, upon its own motion, appointed James Kelly (hereinafter "Kelly"), to serve as a guardian ad litem (hereinafter "GAL") for the children.

**{¶6}** On January 29, 2010, CPSU filed a motion for an ex parte order requesting that the children be removed from Garcia's emergency temporary custody and placed in CPSU's emergency temporary custody. The trial court granted the motion. Thereafter, the trial court held a hearing on the matter and concluded that probable cause existed for the ex parte order, and that the children's continued residence in Garcia's home would be contrary to the their best interest. Based on CPSU's request, the trial court ordered that the children remain in CPSU's emergency temporary custody.

**{¶7}** In February 2010, the matter proceeded to an adjudication hearing. Upon the consent of all the parties, the trial court found by clear and convincing evidence that Jo.S. was a neglected, abused, and dependent child, and that Ja.S. was a neglected and dependent child.

**{¶8}** In March 2010, the trial court held a dispositional hearing. Upon the parties consent, the trial court ordered that the children be placed in CPSU's temporary custody. The trial court also adopted the case plan (hereinafter "plan" or "case plan") submitted by CPSU.[1] The plan set forth five objectives, which read, in pertinent part:

---

[1] CPSU filed a case plan on January 20, 2010, but the trial court never filed a judgment entry adopting or rejecting the plan.

[Joseph] and [Tracy] will be assessed for services through Family Resource Center or another approved provider. [Joseph] and [Tracy] will follow through with all recommended services including (sic) but not limited to (sic) Play Therapy, Maternal Mental Health, Promoting First Relationships and/or Home Based Therapy (HBT). The parents will attend any and all appointments required of them by the service provider, complete all required paperwork, and sign any releases of the service provider and this agency. The foster parents or foster agency will ensure that the children attend all appointments for their individual needs. [Joseph] and [Tracy] will follow through with any and all recommendations made by [the Family Resource Center] service staff or the agency. [Joseph] and [Tracy] will put into practice the skills they learn during parent education.

[Joseph] and [Tracy] will complete a mental health and substance abuse assessment and take the Lifeskills group at Century Health, or another agency approved service provider. [Joseph] and [Tracy] will sign all releases with Century Health and this agency. * * * [Joseph] and [Tracy] will attend all scheduled appointments, and will follow any and all recommendations made by the service provider. If any new concerns arise as a result of mental health, substance abuse or Lifeskills group, (sic) case plan will be amended to reflect these issues and family members will comply with any further services that may be needed.

Foster parents will ensure that [Jo.S. and Ja.S.] are assessed by Wood County Help Me Grow and follow through will (sic) all recommendations. * * *

Foster parents will ensure children's medical care is adequate with checkups as required and all immunizations are kept up to date. * * *

[Joseph] will receive Anger Management Counseling through Century Health, or another agency approved by provider and [Joseph] will disclose any information to counselor regarding violence in his past so that this may be addressed in counseling. * * * [Joseph] will attend all appointments, and follow all service provider recommendations.

CPSU Exhibit 16. The plan also outlined a visitation schedule. Initially, Joseph's and Tracy's visitation with the children was limited to supervised visitation at a designated agency. Based on Joseph's and Tracy's progress with their respective objectives, visitation could progress to off-site and unsupervised visitation.

{¶9} In November 2010, CPSU filed a motion for permanent custody of the children pursuant to R.C. 2151.353, R.C. 2151.413, and R.C. 2151.414 on the basis that it was in the children's best interest, and that the children could not be placed with either parent within a reasonable time and should not be placed with either parent. Specifically, CPSU stated that the children cannot and should not be placed with either Joseph or Tracy based on the following:

> **Following the placement of the child[ren] outside the child[ren's] home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parent to remedy the problems that initially caused the child[ren] to be placed outside the child[ren's] home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child[ren] to be placed outside the child[ren's] home; or**
>
> **Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child[ren] at the present time and, as anticipated, within one year after the court holds the hearing in this matter; or**
>
> **The parents have demonstrated a lack of commitment toward the child[ren] by failing to regularly support, visit or communicate with the child[ren] when able to do so, or by other actions showing unwillingness to provide an adequate permanent home for the child[ren].**

CPSU's Motion for Permanent Custody, p. 2.

{¶10} In April 2011, the trial court held a dispositional hearing on CPSU's motion for permanent custody, during which the following testimony and evidence was adduced.

{¶11} Karmen Lauth (hereinafter "Lauth"), a caseworker with CPSU, testified that she had been assigned to the children's case since its inception in December 2009; that on December 14, 2009, Tracy brought Jo.S. to Blanchard Valley Hospital with a fever and a red, swollen left eye; that a CAT scan of Jo.S.'s eye revealed that his left orbital bone was fractured; that Tracy explained that Ja.S., who was one-year old at the time, threw a "sippy cup" at Jo.S.'s eye, causing the injury (Hearing Tr., p. 33); that the examining physician determined that a one-year old could not generate the force necessary to fracture Jo.S.'s orbital bone, but rather the injury was the result of blunt force trauma and consistent with child abuse (CPSU Exhibit 5); and, that the incident formed the initial basis for removing the children from Joseph's and Tracy's custody.

{¶12} Lauth testified that Jo.S. and Ja.S. were initially placed in Garcia's temporary custody; that, based on her observations, she determined that Tracy had unsupervised custody of the children and that Garcia did not take Jo.S. to a doctor's appointment for his injured eye; that based on these incidents she felt that the children's safety was at risk in Garcia's custody, causing CPSU to request and receive temporary custody of the children. Lauth further testified that CPSU considered placing the children with their paternal aunt, Emily Danner (hereinafter "Danner"); that CPSU conducted a home study of Danner's residence in October

2010; and, that CPSU determined that Danner would not be a suitable placement for the children.

{¶13} Lauth testified that she met with Joseph and Tracy in January 2010 to develop a case plan; that during the meeting she identified several areas of concern, i.e. "reasons for removal," and developed a plan to address those concerns (Hearing Tr., p. 68); that those concerns included Joseph's and Tracy's parenting skills, Joseph's and Tracy's mental health, substance abuse issues, and life skills, and Joseph's anger management (CPSU Exhibit 16, pp. 2, 3, 6); that Joseph and Tracy were in complete agreement with all aspects of the plan; that she met with Joseph and Tracy on a monthly basis to review their progress with the plan's objectives; that the meetings were initially held either at Tracy's residence or CPSU's office; that during two meetings at Tracy's residence it appeared as though Joseph was residing at Tracy's residence; that beginning in September 2010, she no longer met with Joseph and Tracy outside CPSU's office as a result of threats Joseph lodged against her during a counseling session held that month at Pathways;[2] and, that she continued to hold monthly meetings with Joseph and Tracy at CPSU's office until the permanent custody hearing.[3]

{¶14} Lauth testified that the case plan contained five objectives and a visitation plan; that the plan's first objective required Joseph and Tracy to attend parent education classes and filial play therapy at the Family Resource Center; that

---

[2] Pathways provides treatment for individuals suffering from mental health and substance abuse issues. Hearing Tr., p. 179.
[3] Joseph, for reasons unknown, did not attend several of the monthly meetings.

neither Joseph nor Tracy completed this objective because they were administratively discharged due to a lack of attendance; that the plan's second objective required Joseph and Tracy to complete a mental health and substance abuse assessment and take a life skills group at Century Health; that Tracy completed all of the required counseling at Century Health; that, despite completing the counseling associated with the plan's second objective, Tracy did not complete the objective because she failed to demonstrate any progress in her treatment; that Joseph was transferred to Pathways in August 2010, after he informed her (Lauth) that he would be more comfortable at Pathways; that on September 7, 2010, during a group counseling session at Pathways, Joseph lodged threats against her (Lauth) and a counselor; that Joseph was charged with menacing as a result of the incident and entered a plea of guilty to the amended charge of persistent disorderly conduct (CPSU Exhibit 14); that Joseph was administratively discharged from Pathways as a result the incident; that Joseph failed to complete the plan's second objective; that the fifth objective required Joseph to attend anger management counseling at Century Health; that Joseph did not attend anger management counseling and did not complete the plan's fifth objective; that Joseph and Tracy regularly visited the children at Harmony House for supervised visitation; and, that visitation did not progress from supervised to unsupervised visitation due to Joseph's and Tracy's failure to demonstrate progress in any of their assigned objectives.

{¶15} Lauth testified that the plan's third objective required the children to be assessed for developmental delays; that the plan's third objective was completed; that the plan's fourth objective required the foster parents to ensure the children attend all necessary medical appointments and receive their immunizations; and, that the plan's fourth objective was completed.

{¶16} Lauth testified that since January 2010, the extent of Joseph's and Tracy's relationship with their children has been their two-hour supervised visitation, which occurred twice every week; that the children had been removed from the first foster care home due to safety concerns and placed in a second foster care home, where the children currently reside; that the children recognize their current foster parents as their primary caregivers, and that they go to them for comfort, affection, and nurturing; and, that the children's current foster parents would not become an adoptive placement.

{¶17} Lauth testified that Joseph and Tracy are unable to provide the children with an adequate, permanent home now or in the near future; that her conclusion is based on Jo.S.'s injury, the parents respective mental health and substance abuse issues, and the parents failure to demonstrate any progress in their respective treatments; that an extension of the plan would not bring Joseph or Tracy closer to reunification with their children; that CPSU would have considered extending the case plan had the parents received some favorable reports concerning their respective treatments; that, in her opinion, the trial court should terminate Joseph's and Tracy's parental rights and grant CPSU permanent

custody of the children; that adoption would positively benefit the children; and, that it is "almost certain" that both children would be adopted. Hearing Tr., p. 117.

{¶18} Jennifer Schmidt (hereinafter "Schmidt"), a counselor at Pathways, testified that Joseph was referred to Pathways in August 2010; that Pathway's conducted a mental health and substance abuse assessment of Joseph; that Joseph was diagnosed with cannabis dependence and antisocial personality disorder; that Joseph admitted to using cannabis during counseling but would minimize its effects; that on September 7, 2010, during a group counseling session, Joseph explained the benefits of cannabis, in particular, that it "helped him from bashing the face in of his caseworker and it helped him control his anger" (Hearing Tr., p. 189); that she asked Joseph to leave the counseling session due to his unwillingness to speak negatively about cannabis; that Joseph began yelling at those in attendance and lodging threats against her; that she feared for her safety after the incident and filed a complaint with law enforcement; that Joseph was administratively discharged from Pathways as a result of the incident; and, that she has had no further contact with Joseph since the incident.

{¶19} Robin Brown (hereinafter "Brown"), a mental health and substance abuse counselor at Century Health, testified that she worked with Joseph and Tracy; that in February 2010, Century Health conducted a mental health and substance abuse assessment of Joseph; that Joseph tested positive for cannabis, and was diagnosed with cannabis dependence and intermittent explosive disorder

(hereinafter "IED"); that an individual with IED has difficulty controlling his or her temper; that Joseph acknowledged that he had issues controlling his anger; that Joseph was administratively discharged from Century Health in July 2010, after Joseph repeatedly failed to attend required counseling; that in December 2010, Century Health reopened Joseph's case; that Joseph, again, tested positive for cannabis; that since Joseph's case was reopened he has repeatedly failed to attend counseling; and, that Joseph's case with Century Health remains open.

{¶20} Brown testified that in February 2010, Century Health conducted a mental health and substance abuse assessment of Tracy; that Tracy was diagnosed with a dependent personality and adjustment disorder with depressed moods; that an individual with adjustment disorder with depressed moods has difficulty adjusting to certain situations, causing the individual to be depressed; that an individual with a dependent personality relies on someone else to make his or her decisions to a point where he or she cannot separate from the individual on whom he or she relies; that, in her opinion, it is troubling that Tracy, an individual with a dependent personality, is in a relationship with Joseph, an individual with IED; that based on her diagnosis Tracy was referred to the Family Addictions Program;[4] that Tracy discussed setting boundaries between her and Joseph, but never demonstrated any attempts to implement those boundaries; that Tracy made excuses for Joseph's cannabis use, explaining that Joseph needed cannabis to

---

[4] Lauth testified that the Family Addictions Program "is designed to help family members who have members in their family who have an addiction problem, understand the addiction, be able to set limits for that person, and to help them recognize substance abuse, and how it affects the family and the children." Hearing Tr., p. 50.

control his anger (Hearing Tr., p. 226); that Tracy attended all of the required counseling, and had attained "maximum benefit" (Hearing Tr., pp. 227-28); and, that despite attending all of the required counseling Tracy made no progress in remedying her dependent personality.

{¶21} Kari Kessler (hereinafter "Kessler"), an outreach case manager at Open Arms Domestic Violence and Rape Crisis Services (hereinafter "Open Arms"), testified that Tracy was referred to Open Arms in July 2010; that Tracy was enrolled in a victim support group; that Tracy attended all of the support group's sessions; that Tracy acknowledged that she was a victim of domestic violence, but would only concede that verbal abuse was the extent of Joseph's violence; that Tracy often minimized Joseph's abuse; that it was her understanding that Joseph and Tracy were still in a relationship; that she fears for Tracy's safety based on the information she learned during counseling; and, that despite Tracy's completion of the counseling, Tracy made no progress in her treatment.

{¶22} After Kessler's testimony CPSU rested. Joseph and Tracy did not testify or call any witnesses.

{¶23} Kelly testified that he served as the children's GAL from January 2010 until the present; that he had prepared a report outlining his findings and recommendations; that the report was based on his interaction with the children, reports from the various providers associated with the case (i.e., Century Health, Pathways, Family Resource Center, Open Arms), the foster care agency, and his interaction with Joseph and Tracy; that based on these interactions, he

recommended that the trial court grant CPSU permanent custody of the children; and, that he would be opposed to a six-month extension because it was not in the children's best interest. Additionally, Kelly's report included a section entitled "Wishes of the Children," stating, in pertinent part, that "[b]oth children appear to be bonded to the foster care family members." CASA Exhibit A, Report and Recommendations of CASA/GAL, p. 6.

{¶24} Thereafter, the trial court granted CPSU permanent custody of the children. In doing so, the trial court found, by clear and convincing evidence, that the children could not be placed with Joseph or Tracy within a reasonable time nor should the children be placed with Joseph and Tracy; and, that placement in CPSU's permanent custody is in the children's best interest, pursuant to the factors enumerated in R.C. 2151.414(D)(1).

{¶25} It is from these judgments Joseph and Tracy file separate appeals, presenting the following assignments of error for our review.

*Joseph's Assignments of Error*

*Assignment of Error No. I*

**THE HANCOCK COUNTY JOB AND FAMILY SERVICES FAILED ITS DUTY TO USE REASONABLE CASE PLANNING AND DILIGENT EFFORTS AT REUNIFICATION WITH THE PARENT.**

*Assignment of Error No. II*

**THE TRIAL COURT'S DECISION TO TERMINATE THE APPELLANT'S PARENTAL RIGHTS AND GRANT PERMANENT CUSTODY TO THE DEPARTMENT IS AGAINST THE MANIFEST WEIGHT OT THE EVIDENCE.**

*Assignment of Error No. III*

**THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY FOR THE CHILDREN BECAUSE IT WAS NOT IN THEIR BEST INTEREST.**

*Assignment of Error No. IV*

**CPSU DID NOT HAVE (SIC) MAKE A GOOD FAITH EFFORT TO REUNIFY THE APPELLANT WITH HIS CHILDREN.**

*Tracy's Assignments of Error*

*Assignment of Error No. I*

**THE JUDGMENT OF THE TRIAL COURT TO GRANT HANCOCK COUNTY JOB AND FAMILY SERVICES PERMANENT CUSTODY WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. II*

**THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY FOR THE CHILDREN BY FINDING THAT THEY COULD NOT BE PLACED WITH EITHER PARENT WITHIN A REASONABLE TIME AND THAT IT WAS IN THEIR BEST INTEREST.**

*Assignment of Error No. III*

**THE HANCOCK COUNTY JOB AND FAMILY SERVICES FAILED ITS DUTY TO USE REASONABLE CASE PLANNING AND DILIGENT EFFORTS TO ACHIEVE REUNIFICATION WITH THE PARENT.**

{¶26} Due to the nature of Joseph's and Tracy's assignments of error, we elect to address whether CPSU made reasonable efforts to reunite the children

with Joseph and Tracy first. Next, we will address whether the trial court's decision was against the manifest weight of the evidence, and whether the trial court's decision was in the children's best interest.

### *CPSU's Efforts to Reunite the Children with their Parents*

{¶27} In Joseph's first and Tracy's third assignments of error, they similarly contend that CPSU did not make reasonable efforts to reunite them with their children.[5] Specifically, both parents contend that the plan's objectives were not designed to remedy the reasons for which the children were removed; and, that CPSU did not give them a reasonable opportunity to complete the plan's objectives. In addition to the foregoing contentions, Joseph contends that CPSU did not accommodate him or amend the plan when he failed to meet the plan's objectives, while Tracy contends that CPSU's expectation concerning the level of improvement she had to demonstrate before she completed the plan's objectives was unreasonable. Based on the following, we disagree with each of the foregoing contentions.

### *Law*

{¶28} "R.C. 2151.419 imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home." *In re Sorg,* 3d Dist. No. 5-02-03, 2002-Ohio-2725, ¶13, citing *In re Brown* (1994), 98 Ohio App.3d 337, 344.

---

[5] Due to the similarity between Joseph's first and fourth assignments of error, we elect to address them together.

"The agency bears the burden of showing that it made such reasonable efforts." *In re Sorg,* 2002-Ohio-2725, at ¶13, citing R.C. 2151.419(A)(1).

{¶29} "Case plans are the tool that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated." *In re Evans,* 3d Dist. No. 1-01-75, 2001-Ohio-2302, *3. To that end, case plans establish individualized concerns and goals, along with steps that the parties and the agency can take to achieve reunification. Id., citing R.C. 2151.412. Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan. Id. "Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of [the] case." *In re Leveck,* 3d Dist. Nos. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶10.

*Analysis*

{¶30} Both parents contend that the case plan's objectives were not designed to remedy the reasons for which the children were removed. However, Lauth testified that Joseph and Tracy were in complete agreement with every aspect of the plan, which identified the reasons for removing the children from the parents' custody, as well as the means by which the parents could remedy the reasons for removal.

{¶31} Review of the plan demonstrates that the means prescribed by the plan to remedy the reasons for removal were reasonably designed to resolve the

issues that precluded reunification.[6]  The plan's first objective, which applied to both parents, identified the need for additional parenting skills.  To remedy this issue Joseph and Tracy were required to attend the Family Resource Center and follow through with all recommended services including, but not limited to, filial play therapy, maternal mental health, and promoting first relationships therapy.  The plan's second objective, which also applied to both parents, identified the need for a mental health and substance abuse assessment, as well as participation in a life skills group.  To remedy this issue Joseph and Tracy were required to attend Century Health, which provides treatment for individuals suffering from mental health and substance abuse issues, and offers a life skills group.  The plan's fifth objective, which only applied to Joseph, identified the need for anger management counseling.  To remedy this issue Joseph was required to attend anger management counseling at Century Health.

{¶32} Given the foregoing objectives and the means by which they were to be achieved, the fact that the parents agreed to every aspect of the plan, and the counseling and programs to which Joseph and Tracy were referred, we find that the means prescribed to remedy each of the reasons for removing the children were reasonably designed to resolve the issues that precluded reunification.

{¶33} In addition to the foregoing contention, Tracy separately contends that the plan was not developed to address her dependent personality.

---

[6] After thorough review and consideration of the arguments advanced by Joseph and Tracy on appeal, it appears as though neither parent challenges the reasons for removing the children.

Specifically, Tracy contends that her referral to Open Arms and the Family Addictions Program bore no relation to treating her dependent personality. First, this contention does not demonstrate that CPSU failed to diligently pursue the goals of the case plan, as Century Health, not CPSU, referred Tracy to these programs. See *In re Van Atta*, 3d Dist. No. 5-05-03, 2005-Ohio-4182, ¶12. Furthermore, though it is clear that neither program was specifically developed with the intention of treating individuals with a dependent personality, Tracy failed to proffer evidence that participation in these programs confers no benefit to individuals with a dependent personality. We must be cognizant that Tracy was referred to the foregoing programs by a mental health professional, Brown, who testified that the referrals were the direct result of Tracy's diagnosis. Consequently, absent evidence challenging the adequacy of Tracy's course of treatment, we cannot say that her course of treatment was unreasonable or otherwise inadequate in treating her dependent personality.

{¶34} Next, both parents contend that CPSU did not give them a reasonable opportunity to complete the case plan's objectives. Joseph and Tracy began working on the plan's objectives in February 2010. The motion for permanent custody was filed in November 2010. Accordingly, both parents had roughly ten months to either complete or demonstrate some progress in completing their respective objectives.

{¶35} Despite having ten months, Joseph failed to complete or demonstrate any progress with any of his assigned objectives. This failure was the result of

Joseph's inaction and behavior, not the lack of opportunity. Specifically, Joseph failed to complete the plan's first and fifth objectives due to his lack of attendance, while he failed to complete the plan's second objective due to his threatening behavior. Accordingly, we find that CPSU afforded Joseph a reasonable opportunity to complete or demonstrate some progress in completing his assigned objectives.

{¶36} As for Tracy, she too failed to complete her assigned objectives. Like Joseph, Tracy failed to complete the first objective due to her lack of attendance. As for the plan's second objective, Tracy attended all of the required counseling but demonstrated no progress in remedying her dependent personality. Had Tracy demonstrated some level of progress, perhaps an extension of time would have been warranted. However, because Tracy could not demonstrate any progress after months of counseling it was reasonable for CPSU to conclude that an extension would have no effect on her ability to complete the second objective. Accordingly, we find that CPSU afforded Tracy a reasonable opportunity to complete or demonstrate some progress in completing her assigned objectives.

{¶37} Next, Joseph contends that CPSU made no effort to accommodate him or amend the case plan. This Court has previously noted that "the Revised Code only requires that the Agency's case planning and efforts be reasonable and diligent under the circumstances of [the case]. The Revised Code does not require that an Agency walk a parent through every step of the plan; the parent bears some

of the responsibility for accomplishing the objectives of the case plan." *In re S.L.*, 3d Dist. Nos. 4-10-09, 4-10-10, 2010-Ohio-6380, ¶56.

**{¶38}** Joseph's failure to complete all of his assigned objectives was not the result of CPSU's failure to accommodate him or amend the case plan, but rather was the result of his inaction and behavior. In fact, the record contradicts Joseph's contention. Lauth testified that she offered Joseph and Tracy tickets for transportation to and from counseling. Hearing Tr., pp. 108-09. The record also reveals that CPSU attempted to accommodate Joseph when it referred him to Pathways after he informed CPSU that he would be more comfortable at Pathways instead of Century Health. Despite this accommodation, Joseph was administratively discharged from Pathways as a result of threatening behavior. CPSU's duty to diligently pursue efforts to achieve the case plan's goals does not extend to compelling a parent to attend counseling or monitoring the parent's behavior. Rather, those responsibilities lie with the parent. Accordingly, a parent's failure to attend treatment and control his or her behavior does not render CPSU's case planning efforts unreasonable or less than diligent.

**{¶39}** Finally, Tracy contends that CPSU's expectation concerning the level of improvement she had to demonstrate before she completed her assigned objectives was unreasonable. Whether or not CPSU's expectation of Tracy was unreasonable is immaterial, as Tracy, despite having attended all of the counseling associated with the plan's second objective, failed to demonstrate any progress.

Absent progress in her treatment, we cannot say that CPSU's expectation concerning Tracy's level of improvement was unreasonable.

{¶40} In light of the foregoing, we find that CPSU made reasonable and diligent efforts to reunite Joseph and Tracy with their children. Accordingly, we overrule Joseph's first and Tracy's third assignments of error.

### *Trial Court's Decision to Grant Permanent Custody to CPSU*

{¶41} In Joseph's and Tracy's remaining assignments of error, they contend that the trial court's decision to grant CPSU permanent custody of the children was against the manifest weight of the evidence, and that it was not in the children's best interest. For the reasons that follow, we disagree.

### *Standard of Review*

{¶42} "It is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Hayes* (1997), 79 Ohio St.3d 46, 48, citing *In re Murray* (1990), 52 Ohio St.3d 155, 157. Parents have a fundamental liberty interest in the care, custody, and upbringing of their children. *In re Murray,* 52 Ohio St.3d at 157; *Santosky v. Kramer* (1982), 455 U.S. 745, 753, 102 S.Ct. 1388. However, a natural parent's rights are not absolute. *In re Thomas,* 3d Dist. No. 5-03-08, 2003-Ohio-5885, ¶7. "It is plain that the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the

polestar or controlling principle to be observed." *In re Cunningham* (1979), 59 Ohio St.2d 100, 106, quoting *In re R.J.C.* (Fla.App. 1974), 300 So.2d 54, 58.

{¶43} Permanent custody determinations made under R.C. 2151.414 must be supported by clear and convincing evidence. *In re Baby Girl Doe,* 149 Ohio App.3d 717, 2002-Ohio-4470, ¶89, citing *In re Hiatt* (1993), 86 Ohio App.3d 716, 725. "Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes* (1986), 25 Ohio St.3d 101, 104. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof." *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, citing *Ford v. Osborne* (1887), 45 Ohio St. 1. Thus, we are required to determine whether the trial court's determination was supported by sufficient credible evidence to satisfy the requisite degree of proof, *In re McCann,* 12th Dist. No. CA2003-02-017, 2004-Ohio-283, ¶12, citing *In re Starkey,* 150 Ohio App.3d 612, 2002-Ohio-6892, ¶16, and, absent an abuse of discretion, the trial court's decision must be upheld. *In re Robison,* 3d Dist. No. 5-07-41, 2008-Ohio-516, ¶8, citing *Masters v. Masters* (1994), 69 Ohio St.3d 83, 85; see, also, *In re Rinaldi,* 3d Dist. No. 1-02-74, 2003-Ohio-2562, ¶17. A trial court

will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. See *State v. Boles*, 2d Dist. No. 23037, 2010-Ohio-278, ¶¶17-18, citing Black's Law Dictionary (8 Ed.Rev.2004) 11. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219.

*Law*

**{¶44}** "Once a child has been adjudicated dependent, neglected, or abused and temporary custody has been granted to a children services agency, the agency may file a motion for permanent custody * * * ." *In re Esparza,* 3d Dist. Nos. 9-06-25, 9-06-27, 2007-Ohio-113, ¶25. In determining whether to grant the agency permanent custody, the trial court must conduct a two-pronged analysis. *In re D.M.*, 3d Dist. Nos. 5-09-12, 5-09-13, 5-09-14, 2009-Ohio-4112, ¶31. First, the trial court must determine, by clear and convincing evidence, whether any conditions enumerated in R.C. 2151.414(B)(1) are present. *In re Goodwin*, 3d Dist. No. 17-08-12, 2008-Ohio-5399, ¶21. R.C. 2151.414(B)(1) states, in pertinent part:

> **(B)(1) * * * the court may grant permanent custody of a child to a movant if the court determines * * * by clear and convincing evidence, * * * that any of the following apply:**
>
> **(a)  The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children**

**services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

{¶45} In analyzing the condition found in R.C. 2151.414(B)(1)(a), R.C. 2151.414(E) provides several factors for the trial court to consider. *In re Goodwin*, 2008-Ohio-5399, at ¶23. If one or more of the factors enumerated in R.C. 2151.414(E) is found to be present by clear and convincing evidence, the trial court shall find that the child cannot be placed with the parents within a reasonable period of time or should not be placed with the parents. Id.; see, also, *In re D.M.*, 2009-Ohio-4112, at ¶33. The factors enumerated in R.C. 2151.414(E) are, in pertinent part:

**(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court**

**holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;**

\* \* \*

**(4)  The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

\* \* \*

**(16) Any other factor the court considers relevant.**

{¶46} If the condition in R.C. 2151.414(B)(1)(a) is found to be present, the trial court must address the second prong and determine, by clear and convincing evidence, whether granting the agency permanent custody is in the child's best interest. *In re D.M.*, 2009-Ohio-4112, at ¶33; *In re K.H.*, 3d Dist. No. 5-10-06, 2010-Ohio-3801, ¶30.  In making this determination, R.C. 2151.414(D)(1) directs the trial court to consider the following non-exclusive factors:

**(a)  The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c)  The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing**

**agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;**

**(d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

*First-Prong of Permanent Custody Analysis*

{¶47} In considering the first prong, the trial court found, pursuant to R.C. 2151.414(B)(1)(a), that the children could not be placed with Joseph or Tracy in a reasonable time and should not be placed with Joseph or Tracy.  The trial court found that many of the factors enumerated in R.C. 2151.414(E)(1-16) had been proven to exist by clear and convincing evidence.[7]  In particular, the trial court found that CPSU had proven the existence of R.C. 2151.414(E)(1) by clear and convincing evidence.  Based on the following, we find that the trial court did not abuse its discretion, as its finding was supported by clear and convincing evidence.

{¶48} With regard to Joseph, uncontroverted testimony reveals that he failed to complete his assigned objectives.

{¶49} Lauth testified that Joseph agreed with all aspects of the case plan. Lauth met, or attempted to meet, with Joseph on a monthly basis to discuss his progress with his assigned objectives and address any concerns he had in terms of

---

[7] Though the trial court's judgment entry states that many of the factors in R.C. 2151.414(E)(1-16) were proven to exist by clear and convincing evidence, it only discussed R.C. 2151.414(E)(1).  Because a trial court need only find that one of the factors in R.C. 2151.414(E) applies, *In re D.M.*, 2009-Ohio-4112, at ¶33, we will focus our discussion on this factor.

completing his assigned objectives. Joseph, however, failed to complete all of his assigned objectives. Specifically, Joseph failed to complete or attend counseling associated with the each of his assigned objectives. Lauth further testified that Joseph routinely visited the children during scheduled supervised visitation, but explained that visitation did not progress to off-site and unsupervised visitation as a result of Joseph's failure to complete or demonstrate any progress in completing his assigned objectives. Lauth also testified that Joseph was convicted of persistent disorderly conduct as a result of threatening behavior towards a counselor at Pathways.

{¶50} Brown testified that Joseph was referred to Century Health in February 2010. Joseph tested positive for cannabis, and was diagnosed with cannabis dependence and IED. In response to his diagnosis, Joseph was referred to individual and group counseling. Eventually, Joseph was administratively discharged from Century Health due to his repeated failure to attend counseling. Joseph's case was, however, reopened at Century Health in December 2010, but Joseph continued his practice of not attending counseling.

{¶51} Schmidt testified that Joseph was referred to Pathways in August 2010. Joseph was diagnosed with cannabis dependence and antisocial personality disorder. In response to his diagnosis, Joseph was referred to individual and group counseling. Joseph's attendance was intermittent. Schmidt further testified that during a group counseling session Joseph was asked to discuss the negative aspects of cannabis. Instead of discussing the negative aspects of cannabis, Joseph

extolled the effects of cannabis, explaining that it "helped him from bashing the face in of his caseworker and it helped him control his anger." Hearing Tr., p. 189. As a result of his comments, Schmidt asked Joseph to leave the group, at which point Joseph hurled expletives at those in attendance and threatened Schmidt. As a result of Joseph's violent and threatening behavior he was administratively discharged from Pathways.

{¶52} Based on the evidence presented, we find that there was clear and convincing evidence that the children could not be placed with Joseph in a reasonable time and should not be placed with Joseph. Although Joseph routinely visited the children during scheduled visitation, the record reveals that he repeatedly failed to complete his assigned objectives. See *In re W.A.*, 10th Dist. Nos. 06AP-485, 06AP-486, 2006-Ohio-5750, ¶17 ("Failure to complete significant aspects of a case plan, despite opportunities to do so, is grounds for terminating parental rights."); *In re Brofford* (1992), 83 Ohio App.3d 869, 878. Given Joseph's failure to complete or demonstrate any progress in completing his assigned objectives, we find that the trial court did not err when it found that the children could not be placed with Joseph in a reasonable time and should not be placed with Joseph.

{¶53} As for Tracy, the uncontroverted testimony reveals that she too failed to complete her assigned objectives.

{¶54} Lauth testified that Tracy agreed with all aspects of the case plan. Lauth met with Tracy on a monthly basis to discuss her progress with her assigned

objectives and address any concerns she had in terms of completing her assigned objectives. Tracy, however, failed to complete all of her assigned objectives. Like Joseph, Tracy failed to complete the first objective due to her lack of attendance. As for the second objective, Tracy routinely attended required counseling but demonstrated no progress in her treatment, and consequently did not complete the second objective. Lauth further testified that Tracy routinely visited the children during scheduled supervised visitation, but explained that visitation did not progress to off-site and unsupervised visitation as a result of Tracy's failure to complete or demonstrate any progress in completing her assigned objectives.

{¶55} Brown testified that Tracy was referred to Century Health in February 2010. Tracy was diagnosed with a dependent personality and adjustment disorder with depressed moods. In response to her diagnosis, Tracy was referred to individual and group counseling. Brown was concerned about Tracy's relationship with Joseph in light of her dependent personality and his anger management issues. Tracy discussed setting boundaries between her and Joseph, but never demonstrated any attempts to implement those boundaries. Instead, Tracy made excuses for Joseph's cannabis use, explaining that Joseph needed cannabis to control his anger. Although Tracy attended all of the required counseling, Brown testified that Tracy made no progress in remedying her dependent personality.

{¶56} Kessler testified that Tracy was referred to Open Arms in July 2010. Tracy acknowledged that she was a victim of domestic violence, but would only concede that verbal abuse was the extent of Joseph's violence. In addition, Tracy routinely minimized Joseph's abuse. Although Tracy attended all of the support group's sessions, Kessler testified that Tracy made no progress in her treatment.

{¶57} Based on the evidence presented, we find that there was clear and convincing evidence that the children could not be placed with Tracy in a reasonable time and should not be placed with Tracy. Although Tracy routinely attended counseling associated with the second objective, the successful completion of counseling or any other aspect of a case plan is not enough. A parent can successfully complete the requirements of a case plan, but not substantially remedy the conditions that caused the children to be removed, as the case plan is "simply a means to a goal, but not the goal itself." *In re E.S.*, 8th Dist. Nos. 95915, 95916, 2011-Ohio-2408, ¶13, quoting *In re C. C.,* 187 Ohio App.3d 365, 2010-Ohio-780, ¶25. Consequently, the fact that Tracy attended all of the counseling associated with the second objective is immaterial where the record demonstrates that Tracy made no progress in remedying the reasons for the children's removal. Furthermore, Tracy failed to complete the first objective due to her lack of attendance. See *In re W.A.*, supra. Given Tracy's failure to complete or demonstrate any progress in completing her assigned objectives, we find that the trial court did not err when it found that the children could not be placed with Tracy in a reasonable time and should not be placed with Tracy.

*Second-Prong of Permanent Custody Analysis*

**{¶58}** In considering the second prong, the trial court found, pursuant to the factors enumerated in R.C. 2151.414(D)(1), that granting permanent custody to CPSU was in the children's best interest. Based on the following, we find that the trial court did not abuse its discretion, as its finding was supported by clear and convincing evidence.

**{¶59}** Initially, Tracy contends that the trial court did not explicitly find that terminating her parental rights was in the children's best interest. This Court has held that the trial court must either specifically address each of the best interest factors in its judgment entry, or otherwise provide some affirmative indication in the record that it has considered the same. *In re D.H.*, 3d Dist. No. 9-06-57, 2007-Ohio-1762, ¶21. Here the judgment entry states, in pertinent part:

> **\* \* \* [T]he court has considered the lack of relationship of the children with their parents, relatives, foster parents, out-of-home providers and other people who may significantly affect the children's need for legally secure permanent placement, and the probability that this type of placement cannot be achieved without granting Permanent Custody to the Hancock County Job and Family Services-Children's Protective Services Unit. The court further has considered the custodial history of the children along with the wishes of the children, ages 2 and 3, as expressed to the court by way of recommendation from their CASA. \* \* \***

Permanent Custody Judgment Entry, p. 3. Having considered the foregoing language in light of the entire judgment entry, we find that the judgment entry demonstrates that the trial court considered the factors enumerated in R.C. 2151.414(D)(1) as to Joseph and Tracy.

{¶60} Turning to the best interest factors, the record demonstrates that Jo.S. and Ja.S. were removed from their parents' custody in December 2009.[8] Jo.S. and Ja.S. were two months and one-year old, respectively, when they were removed from their parents' custody. The children were removed from their parents' custody as a result of a severe injury to Jo.S.'s eye. Though the cause of the of the injury was never definitively established, Tracy's inability to offer a reasonable explanation as to how the injury occurred combined with the treating physician's conclusion that the injury was consistent with child abuse is sufficient for a fact finder to conclude that the injury was either the result of child abuse or parental neglect.

{¶61} Since December 2009, the extent of Joseph's and Tracy's relationship and interaction with Jo.S. and Ja.S. has been two-hour supervised visitation, which occurs twice every week. Joseph and Tracy have routinely visited the children during scheduled visitation, but have made no progress in remedying the reasons for which the children were removed, despite having ample time and opportunity to demonstrate some progress. Meanwhile, the children, with the assistance of their foster parents, have completed the plan's third and fourth objectives. Lauth testified that the children recognize their current foster parents as their primary caregivers, and that the children go to them for comfort, affection, and nurturing. Similarly, the GAL's permanent custody report noted

---

[8] The record contains no evidence of the parents' relationship or interaction with their children prior to December 2009.

that the children "appear to be bonded to the foster care family members." CASA Exhibit A, Report and Recommendations of CASA/GAL, p. 6. Lauth further testified that adoption would positively benefit the children, and that it is "almost certain" that both children would be adopted. Hearing Tr., p. 117.

{¶62} The record further demonstrates that the children are too young to express their own wishes concerning permanent custody. Consequently, Kelly, the children's court appointed GAL, expressed the children's wishes. In doing so, Kelly considered his interaction with the children, the foster care agency, the children's parents, as well as his review of the reports from the service providers associated with the case (i.e., Century Health, Pathways, Family Resource Center, Open Arms). Based on the foregoing, Kelly testified, and his permanent custody report concluded, that granting CPSU permanent custody would be in the children's best interest.

{¶63} Lastly, the record demonstrates that CPSU attempted to place the children outside the agency. Initially, CPSU attempted to place the children with their paternal grandmother, Garcia. During the course of Garcia's temporary custody, however, there was evidence that Tracy had unsupervised custody of the children and that Garcia had not taken Jo.S. to a doctor's appointment for his injured eye. Consequently, CPSU determined that the children were not safe in Garcia's custody, and eventually had them removed. CPSU also conducted a home study of Joseph's sister, Danner. Upon completion of the home study, CPSU determined that Danner would not be a suitable placement for the children.

**{¶64}** In light of the foregoing, we find that there was clear and convincing evidence supporting the trial court's finding that granting CPSU permanent custody was in the children's best interest.

**{¶65}** Accordingly, we find that the trial court's decision was not against the manifest weight of the evidence and that the trial court did not abuse its discretion by granting CPSU permanent custody of the children, as there was clear and convincing evidence to support its decision.

**{¶66}** Therefore, we overrule Joseph's and Tracy's remaining assignments of error.

**{¶67}** Having found no error prejudicial to either Joseph or Tracy herein, in the particulars assigned and argued, we affirm the judgments of the trial court.

*Judgments Affirmed*

**SHAW and WILLAMOWSKI, J.J., concur.**

**/jlr**